AMY BILLINGS *vs.* CLAUDIUS BAKER, PERRY P. BILLINGS and
others.

The acts of 1848 and 1849 " for the protection of married women," entirely
    abrogate the existence of prospective tenancy by the curtesy, and were
    intended to do so. ROSEKRANS, J., dissented.

Every quality and incident that is necessary to constitute a tenancy by the
    curtesy is destroyed by the provisions of those acts.

The husband cannot now be seised of the estate, during the life of the wife.
    It is not alienable by the husband. It is not liable for his debts. The estate
    cannot *vest* during the life of the wife. And as there is no *initiate* estate at
    her death, there is no estate to be consummated.

Those statutes are remedial in their nature, and should be construed with a
    view to the advancement of the remedy. The courts should look at the
    precise words used in the statute, and then construe them in their ordinary
    sense, unless such construction would lead to an absurdity or manifest
    injustice.

Before those statutes, the right of married women to hold separate estates,
    independent of their husbands, was recognized as a part of the common law.

The plain language of the statutes themselves expressly negatives any other
    construction than an abrogation of the estate of curtesy.

The *intent* of a remedial statute, like the intent of an agreement, is to be
    gathered from the plain language employed in it.

THIS was an appeal from an order made at a special term,
upon a motion by the plaintiff to amend her complaint,
by striking out the name of her husband, Perry P. Billings,
as a defendant. The action is for partition of real estate,
which came to the plaintiff by inheritance, since the acts of
1848 and 1849, " for the more effectual protection of married
women." The husband was made a defendant under the im-
pression that as the husband of the plaintiff, and by the birth of
issue, and seizin of the wife during coverture, he had an in-
choate interest as tenant by the curtesy. On the trial before
a referee, one of the defendants was sworn as a witness in his
own behalf. The plaintiff was then advised that her testimony
became important in the action, in her own behalf, but that
she was an incompetent witness, by reason of her husband's
being a party. She then made the motion to strike out her
husband's name, to enable her to be a witness in her own be-

half. The motion was granted at special term, and was argued there by

*H. W. Merrill*, for the plaintiff.

*C. S. Lester*, for the defendant.

POTTER, J., delivered the following opinion, at the special term.

The facts set forth in the moving affidavits are sufficient to show that it is in furtherance of justice to grant this motion, and it must therefore be granted, unless the defendant Perry P. Billings, as the husband of the plaintiff, has either a present or prospective interest in the plaintiff's real estate. If he has such an interest, then the motion should be denied. At common law prior to the statutes of 1848 and 1849, the husband would have been tenant by the curtesy initiate, in such an estate; he is so still, if the estate was owned or acquired by the wife previous to the passage of those statutes, if the marriage was also prior to that time. If those statutes have either by their express provisions, or by necessary implication, abrogated prospective tenancy by the curtesy, then the defendant Billings has no interest in this action. Tenancy by the curtesy, is where a man marries a woman, seised at any time during the coverture of an estate of inheritance, in severalty, in coparcenery, or in common, and hath issue by her, born alive, and which might by possibility inherit the same estate as heir to the wife, and the wife dies in the lifetime of the husband, he holds the land during his life " by the curtesy of England." (4 *Kent's Com.* 27.) The revised statutes, (*vol.* 1, *p.* 754, § 20,) expressly recognize the existence of this estate, and provide that " the estate of a husband, as tenant by the curtesy, shall not be affected by any of the provisions of this chapter." Four things are necessary to constitute this estate, viz: 1. Marriage; 2. Actual seizin of the wife during coverture; 3. Issue born alive; and 4. Death of the wife. (4 *Kent,*

29.)   The common law vested this estate in the husband, immediately upon the birth of a child.   (2 *Black. Com.* 127.)

If the reasons for the introduction of this peculiar feature of the common law called "tenancy by the curtesy' in estates in land, had ceased to exist, if in practice the law failed to be useful; or if it had become an evil, or was inapplicable to our American system of laws, it presented a reason, perhaps a necessity, for a remedial act to abrogate it, and such remedial statute is then to be construed with reference to the condition of things thus presented.   One of the reasons for the introduction of this estate into the English system, was, that the husband being the natural guardian of his child, was entitled to the profits of the land in order to maintain the child; but a more prominent and important idea of the system was, the reason that then existed in England in regard to all estates in land under the feudal law; to wit, that the husband having become dignified by having an interest in lands, was bound to do homage to his superior lord, and the interest being once vested in him, it was the policy of the feudal system, not to suffer it to determine during the life of the husband, as otherwise the lord might lose the homage that was his due from the land.

To this estate the husband never had any *natural* right. (*Bac. Abr. Tenant by the Curtesy.*)   Sir J. Jekyl says, "This estate has no *moral* foundation to support it." (*Green. Cruise, tit.* 5, § 3.)   *Crabb,* an English writer, says, "The term curtesy is derived from courtesie, Latin *curialitas;* to signify suavity or urbanity, to denote that the custom sprung from *favor to the husband,* rather than from any *right.*"   By thus becoming the vassal or tenant of his superior lord, he was permitted "by the curtesy of England" to attend his lord's court, or curtis, (as it was called,) and to do him homage, by reason of having become the husband of a wife who had died possessed of an estate in lands, after issue born.   Such were the reasons, and such the basis for the introduction of such a title to lands into the law of England.   This common law

was adopted into our system in this state, by the 35th section of the constitution of 1777. This examination of its history, of its basis, and the reason of its adoption, seemed to me to be necessary, in order to ascertain, first, whether such reasons continued to exist; and next, the applicability or basis of such a law to our own local system; and lastly, to examine whether these causes may not have had an influence in determining the *intent* of the legislature, either in continuing or in abrogating this feature of law in regard to real estate, by the acts of 1848 and 1849, above referred to.

There *is* no doubt that the legislature had the *power*, either to modify or abrogate this estate, at their pleasure, if it was regarded as public policy so to do. It was so held in *Sleight* v. *Read*, (18 *Barb.* 165,) and *Moore* v. *Mayor of New York*, (4 *Seld.* 114.) "It is not," says Denio, J., "a part of the marriage contract which cannot be affected or impaired by statute, but it stands on the foundation of positive law, as one of the institutions of the country." From this we see 1st. That the legislature had power to abrogate this estate as to all prospective cases; 2d. That every reason for the introduction of this estate into our system of law, except only that of the maintenance and support of the children, is entirely inapplicable to the public policy of this country, and to the institutions of this state; and 3d. That the provisions contained in those acts were intended to introduce a most important, if not an entire change in the existing law of this state in that particular. The question then is, have future estates of tenancy by the curtesy been abrogated by those acts?

The answer to this question depends mainly upon the construction to be given to (what seems to be) the very plain language of the act. In determining such construction, we must be guided by those sound rules of interpretation, which long experience and the settled wisdom of the courts have uniformly approved. This, as has been said, is to be regarded as a *remedial* statute; and its language is to be so construed as to give effect to the end the legislature had in view, and if

possible to prevent a failure of the remedy intended. (1 *Kent's Com.* 465.) What then was the mischief felt, that was the occasion of, or created the necessity for, this statute? What was the object intended to be effected by it? Experience had shown that the only sensible reason for the introduction of this tenure into real estates, to wit, the maintenance of the children, had sadly failed of its object. The estate was not only alienable, but was also liable to the payment of the husband's debts. And it was found that in too large a proportion of cases, worthless, spendthrift and intemperate husbands, instead of using the estates intended for the support, maintenance and education of their children, exhausted them upon themselves, during their own lives, too frequently leaving the children objects of public care. What was the remedy? Let then this statute first speak for itself. The first section of the act of 1848 provides for the estates of females who may thereafter marry. It provides that her estate, real and personal, and the rents, issues and profits thereof, shall not be subject to the disposal of her (future) husband, nor be liable for his debts, and shall *continue* her sole and separate property, as if she were a single female.

The second section was intended to carry out the same provision as the first, in relation to estates of married women. It has been already judicially passed upon in various reported decisions ; but its application to the property of the wife who was married at the time of the passage of the above act, is not a question necessary to be examined here, except so far as it goes to show the *intent* of the legislature.

The third section, as amended in 1849, provides that any married female may take by inheritance, or by gift, grant, devise or bequest, (from any person other than her husband,) and hold to her sole and separate use, and convey and devise, real and personal property, *and any interest or estate therein,* and the rents, issues and profits thereof, in the same manner, and *with like effect,* as if she was unmarried, and the same

shall not be subject to the disposal of her husband, nor liable for his debts.

The next section of the act of 1849 authorizes trustees, who hold estates in trust for married women, to convey such estates to them, subject to certain regulations, for their sole and separate use and benefit. It might here be sufficient to inquire whether the estate of a female before marriage is not *absolutely* her's for life, forever—without condition—without qualification—and subject by law to be inherited directly from her by heirs. It is so, beyond all question. Whatever estate she then has in it, by the first section of the act of 1848, *shall continue her sole and separate property as if she were a single female.* This could not be, if any other person can acquire an interest in it. If the *intent* of a statute is to be construed in the same manner as the *intent* in a devise or settlement, the case of *Hearle* v. *Greenbank*, (3 *Atk.* 695,) is in point. The testator in that case devised an estate to trustees, " to and for the sole and separate use of his daughter Mary, wife of Wm. Winsmore, during her life, and at her disposal, and not to be subject to the debts, power or control of her husband." And though a husband was entitled to a curtesy in a trust estate, yet Lord Hardwicke said : "The father, whose estate it was, has made the daughter a feme sole, and has given the profits to her separate use ; therefore, what seisin could he, (the husband,) have during the coverture ? He could neither come at the possession, nor the profits. To admit that the husband was seised, would be directly contrary to the father's *intent*." And he held that the husband could not have curtesy. What single quality or incident that constitutes a tenancy by the curtesy is left, or remains to the husband, under this act ? A tenancy by the curtesy, vested on the birth of a child. (2 *Bl. Com.* 127. 2 *Cowen*, 440.) This quality is now destroyed. It was an estate liable to be sold on execution to pay the husband's debts. (*Schermerhorn* v. *Miller*, 2 *Cowen*, 439.) This quality is also destroyed. The husband, as tenant by the curtesy, could alien and convey such estate. He has no such

Billings *v.* Baker.

power now. One of the requisites to constitute this estate was a marriage. This statute cuts off this constituent in its creation, in advance, and expressly declares the wife shall *continue* to hold to her sole and separate use, as if she were a single female. So long as she lives, therefore, the marriage in respect to this estate, does him no good, for the estate cannot begin during her life. Lord Coke says, " Albeit the estate be not consummate till the death of the wife, yet the estate hath a beginning in the life of the wife." (*Co. Lit.* 30 *a.*) And when she is dead, as there has been no such estate to begin ; at her death, there is none to be consummated. Actual *seizin* of the wife was another constituent quality of this estate. By such *seizin* of the wife, the husband became seised of his interest therein. This quality is also abrogated. Formerly the seizin of the wife became the seizin of the husband and wife ; now it is a seizin for herself alone. By the provisions of this statute, there is not left to the husband one quality that is required to constitute a tenant by the curtesy inititiate, nor one incident of the estate that he can enjoy. How then can it exist? It may be said, indeed, that since the passage of that act, so far as regards all prospective estates, a tenant by the curtesy initiate is a legal impossibility. Death of the wife changed the tenure from a tenancy by the curtesy initiate, to a tenancy by the curtesy consummate. Now there is no such tenure to be consummated or changed. As a tenancy by the curtesy initiate cannot exist or begin, how can the latter estate be consummated from it? How is it now to be constituted? If it can now be constituted, the legal definitions of its character must be changed, new qualities must enter into its composition, and a new definition must be prepared to describe it. And for what purpose, under our system of laws, and with our republican institutions? What one single argument can now be produced in favor of its usefulness, as a reason for retaining it? We have here no lords to whom we are bound to render homage. We are all equal peers. A citizen here receives no new dignity by holding an interest in lands.

The maintenance and support of the child, which was a reason for the introduction of such an estate, is more certain now by directly inheriting from the mother, than to be dependent upon a father, whose dignity and importance consist in the fact of having been the husband of a wife who had an estate in lands.

The language of this act is entirely inconsistent with the idea that there is a tenancy for life existing in another person. Is there any such tenure or right as tenancy by the curtesy, attached to the estate of a single female? And does not this statute in the most express language declare that the wife holds this estate " as if she were a single female"? How then does he acquire a right therein? Does not the same statute declare that this estate " shall not be subject to the disposal of her husband"? What estate? Not his estate, but her estate; he has none in it. Is this estate, which was her's absolutely, and which the statute says *shall so continue,* limited to her for her life? By what law? The legislature had no power to limit an estate that was absolutely her's. How then does the husband acquire any rights to it? By the omission to give it to any body else? Are estates to land acquired by omissions in this way? He acquires no express statute right to it. He has no *natural* right to it by common law. (2 *Bac. Abr. tit. Tenant by the Curtesy.*)

The effect of this statute then, is that the useless and ridiculous fiction of " tenancy by the curtesy of England" is abrogated, and no longer remains to disfigure our system of common law, or the republican institutions of this state. Nor is the argument ended here. There are negative words enough in this statute alone to settle this question of intent, without going farther, to wit: "This estate (of the wife) shall not be subject to the disposal of her husband." If after her death, it becomes his by this English fiction, would it not, in the very face of the statute, be subject to his disposal? "Nor be liable to his debts," says the statute. If he has the use of it for his life, could he not pay his debts with it? Is this old remnant of an obsolete system still to be regarded as stronger

Billings *v.* Baker.

than the negative language of an applicable, remedial statute ?
If this excrescence of another age was regarded as an evil by
the legislature, is it to be supposed that they stopped half
way, when attempting to apply the remedy of abrogation ?

I think it more important, at this day, that the courts
should adhere strictly to the sensibly expressed intention of
the legislature, than to permit old maxims, applicable only to
ancient observances of an obselete system of feudal tenures, to
control the construction of our own abrogating statutes.    Our
rights, under *remedial* statutes, ought to rest upon a surer
basis than this.    Even in England, it was held that in case
of a *remedial* act, every thing is to be done in the advance-
ment of the remedy that can be done consistently with any
construction that can be put upon it.    (*Johnes* v. *Johnes,*
3 *Dow.* 15.)    Nor is the view I have taken of the construc-
tion of this statute, without high authority.    In *Westervelt*
v. *Gregg,* (2 *Kern.* 211,) Denio, J., said : "I am constrained
to believe that the true meaning of the section is, (§ 2 *act of*
1848,) that all property which the wife owned at the time of
the marriage, and that all such as she had acquired by gift,
devise or otherwise, during the coverture, but before the pass-
ing of the act, should thereafter be deemed to be vested in her
as though she was a feme sole, to the exclusion of any title
which by the pre-existing laws the husband had acquired in
it, by virtue of the marriage relation."    To understand the
whole intent of the legislature, the whole three sections of the
act of 1848, must be read together, and by such a reading,
no doubt can remain of the intent.    We are at least bound
to suppose that the legislature employed in this act such lan-
guage as would most directly and aptly express the object they
had in view ; that they intended what they said, and the court,
instead of looking beyond the act, for a construction to limit
or cripple its *remedial* intent, will best discharge their duty
by giving to words that obvious meaning which is consistent
with the ordinary and common sense understanding of them.
Why, if it was not the clear intent of the legislature to abro-

gate the tenancy by the curtesy, did they by section two of the act of 1849, authorize trustees, holding estates for married women, to convey them to such married women? It was doubtless only upon the theory that she was to be sole owner. If by such conveyance the husband acquired a vested interest in the estate, the very object of the trust estate might be thus defeated. I cannot be made to doubt, upon the considerations above expressed, that the legislature intended to make, and did make, an entire and radical change in the law applicable to the condition of things as they existed here; a change demanded by the highest considerations of public policy, dictated by demands of the purest benevolence, and resting upon a sound basis of practical good sense. It is of itself a consistent and reasonable statute, suited to the genius and spirit of the age, and to the wants and institutions of a country whose laws lay claim to the basis of equality of rights. It is entitled to fair judicial construction by the courts, having reference to the existing mischief, and to the intended remedy, divested of the clogs to progress, by a veneration for any of the ancient relics of feudalism. It would fail of being the remedial statute intended, if it did not remove the unjust disabilities of the wife, arising from coverture, and substitute in some degree, a sensible, living, practical equality, for the exploded fiction that the legal existence of woman, as well as her estate, is merged in a husband by marriage; nor only that, but that her own subsistence for her life, as well as the support and maintenance of her children after her death, of an estate derived perhaps solely from her, are to be put at more than the peril of loss, that a husband, whether worthy or worthless, may be dignified by its control. We have already seen that the reasons for its introduction into a system of law, no longer exist. There is found in practical experiment no such superiority in the husband, in regard to a provident management of estates, that demands its longer continuance.

Divesting then this question, as I do, of all reference to common law tenures, which were intended to be abrogated,

and construing this remedial statute by the light of its own plain intent, as manifested in its clear and express language, the parties in interest are restored by it, in degree, to their natural rights.   What are they?   The right of independent existence on the part of the wife—the right to enjoy property, and the right to a certain support, and maintenance of her children.   These are as strong by nature, and have as high a claim to consideration and protection upon public justice, as the claims of the husband's superior dignity.   The very spirit of our government is, and it should be of our laws, that the rights of each citizen to support and protection, whether infant or adult, whether male or female, husband or wife, shall stand upon an equality, and the power of any one so to control the rights or interests of another, as to annihilate or destroy them, is contrary to nature, and should be subject to the control of law.   The courts for a long period, had been gradually relaxing the rigid rules of the common law, in order to aid married women in the protection of their estates, against improvident husbands.   And equity, especially, has been prompt to uphold marriage settlements, devises and conveyances in trust for them, until "a wife's equity" had become one of the institutions of the country.   (*Sleight* v. *Read*, 18 *Barb.* 162.)   And the civil law, still more reasonable, ever regarded the husband and wife as being separate and distinct persons in regard to their estates.   (2 *Story's Eq. Jur.* § 1368.)   And as authority to sustain the interpretation of this statute which I have given, I find it laid down as a rule, that even in legal estates, unless the husband had possession during the coverture, so as to be in the receipt of the rents and profits, he was not entitled to curtesy.   (1 *Bright on Husband and Wife*, 120.)   So too, in the settlements of estates upon the wife, when the intention manifestly appears in the deed of settlement, that the husband should have no interest in the estates so settled upon the wife, she is converted into a feme sole during her life. In such cases, whether the equitable inheritance devolved to her as heir, or by limitation immediately, or after intermediate

limitations, her husband will not be entitled to curtesy, and if it be a trust to be carried into effect in equity, the court will so model the decree as to prevent curtesy. (1 *Bright on Husband and Wife*, 137.)

With all my veneration for the common law, whenever its existence is found to be inconsistent, not only with the just and equal rights of a class of citizens, but in direct conflict with our remedial statutes—when I find its existence has neither a natural nor a moral basis to sustain it—I must find a more solid reason for its retention than the ancient custom of rendering homage to a superior lord, in order to create any reverential awe that shall restrain me from an examination as to its usefulness, or hesitation about construing a statute sensibly, for fear of derogating from the ancient glory of that system.

I have come to the conclusion above expressed, but I admit, not without much embarrassment, on account of the highly respectable authorities deciding the same question the other way. I refer to *Hurd* v. *Cass*, (9 *Barb*. 366,) per Mason, J., at special term; and *Clark* v. *Clark*, (24 *Barb*. 581,) per Marvin, J., also at special term; the latter, however, basing his opinion mainly on the former. But what is a little singular, the last authority cited by Justice Marvin, is directly against the conclusion he himself arrives at, to wit: *Crabb on Real Property*, § 1106. In his conclusion, the learned judge also says: "If the legislature had intended to deprive the husband of his rights by the curtesy, when the wife had not conveyed or devised the estate, it should so have expressly declared in the act." With all deference, I think if the legislature after passing an act, which in its express terms did take it away, had intended still to retain it in the system, they would have said so, as they did in the 1*st R. S.* 754, § 20, in which such a reservation seemed to be necessary, in order to secure it from abrogation. I find no reported general term decisions directly upon the question. I find nothing in the case of *Colvin* v. *Currier*, (22 *Barb*. 372,) in conflict with the

views I have expressed, but on the contrary, much to sustain them. That case holds that the estates of the wife under the acts of 1848 and 1849, are her separate legal estates. The case of *Sleight* v. *Read*, (18 *Barb.* 159, 164, 165,) I regard also as sustaining my views. The case of *Shumway* v. *Cooper*, (16 *Barb.* 560,) is also cited by the defendants' counsel on their side. This is a general term decision, in the 5th district. I have read the very able opinion of Justice Allen, in that case, and find that this question did not arise there at all. It was the rights of a husband under the statute of distributions, not the common law rights of a tenant by the curtesy, that were discussed in that case. That statute gives the husband, as administrator, the right to his wife's personal estate. (2 *R. S.* 98, § 86, [79.]) That statute, it was held in that case, was not repealed by the acts of 1848 and 1849, but was modified in this particular, that the wife possessed the power during her life, to dispose of her personal estate, which if she failed to do, the husband took as before, under the statute. There is a case (*Benedict* v. *Seymour*, 11 *How. Pr. R.* 176, 177,) which so far as it goes, sustains my views, though the question of tenancy by the curtesy, did not directly arise in the case.

The motion must be granted on the payment of costs of opposing the motion, it being a motion for a favor.

From the order of the special term there was an appeal to the general term, where the motion was argued by

*A. Pond* and *A. Bockes*, for the defendants.

*H. W. Merrill*, for the plaintiff.

*By the Court*, POTTER, J. The court are unanimous in affirming the order of the special term, but upon the question on which almost entirely it was argued at the special term, and again here, to wit: whether Perry P. Billings the plain-

tiff's husband has an interest in the estate proposed to be partitioned, one of my brethren dissents from the opinion here expressed.

It is exceedingly important that this question should have an early and a correct settlement, on account of the frequency of the occasions on which the question must necessarily arise in future practice. It is certainly most natural that different and various constructions should be given to the meaning of this statute, for the reason that it makes important changes in the law in regard to the marital relation, so far as the rights of property are concerned. These somewhat extraordinary innovations in established law in that regard, are in conflict with such opinions as time and long experience had adopted as settled, and which had become familiar to the courts and to the bar; but it now being a law, and proceeding as it does from the highest source of power authorized to enact laws, it is the duty of the court to give it due regard, and to construe it according to its true spirit and intent; and it is therefore not at all surprising that at first, like all other measures of sudden and violent reform, it encounters the prejudices arising from long established and fixed habits of thought; from a committed feeling of regard and veneration for ancient forms, precedents, maxims and adjudications, and be subjected to a jealous criticism of its new and somewhat unfamiliar forms of expression. The highest court of this state, however, has already broken ground in this particular, and has declared in regard to it, as follows: "The object of the statute is *remedial;* to remove the disability which the common law attached to coverture, and to enable a married woman to have something which she might call her own, and to do something for her own subsistence, and that of her offspring;" and also, "that the act should have a liberal construction." (*Darby* v. *Callaghan,* 16 *N. Y. Rep.* 79.) In the case of *Wadhams* v. *The American Home Miss. Soc.* (2 *Kern.* 415,) Denio, J., says: "The statute of 1848 was the commencement of a *new system* respecting this branch of domestic relations." Con-

Billings *v.* Baker.

struing this statute then, in the spirit that it becomes the duty of the court to construe a remedial statute, giving the fullest effect to every provision that can consistently be put upon it in order to advance the remedy ; or in other words, considering that " the court is to look at the precise words used, and to construe them in their ordinary sense, unless this construction would lead to an absurdity, or manifest injustice," let us see what is its real intent, as it regards the question at issue. The question is, do the provisions of the acts of 1848 and 1849, in the cases therein declared, vest the *whole* title of the estates in married women, or has the husband, notwithstanding the plain and comprehensive terms employed in this statute, a vested, inchoate interest therein ? It must be borne in mind that the object of this statute is to enfranchise a class of citizens, or to restore them to natural rights, and to create a new estate ; not to modify an old one : it relates to the rights to estates in the future ; not to the past. It must then be construed with reference to its own objects, more than to such objects as relate to existing estates ; and as it does not in any degree interfere with the latter, so the latter have no claim to a participation in this new estate, unless it is so expressed in the charter of its creation. "*Expressio unius est exclusio alterius.*" Let us look at this estate then for a moment, as at the object of a new creation, divested of its connection with the past, with existing or with other systems of law affecting those relations. This, I apprehend, is the light in which one should view its remedial provisions, and looking at it in the light of its own clear language, see what conclusions the philosophy of plain common sense would determine to be its meaning. A married female " may take by inheritance, or by gift, grant, devise or bequest, from any person other than her husband, and hold to her sole and separate use, and convey and devise, real and personal property, or any estate or interest therein, and the rents, issues and profits thereof, in the same manner and with like effect as if she were unmarried." This seems to be clear, plain language, quite sufficient in the com-

mon mind, for the full creation of a new estate; and unless this grant is to be controlled by something *not* expressed in its language—by something to be incorporated into it by the power of construction, in regard to the rights of some ancient tenures entirely repugnant to its spirit, and with which its language seems to have no relation, except so far as in conflict and intended entirely or in degree to change that character—the ordinary understanding would experience no difficulty in comprehending its meaning to be that the *whole* estate so to be created, and that could be enjoyed, with all its incidents, would belong to such married woman, precisely as if she were a *feme sole*, and like the estate of a feme sole, at her death, in the absence of a devise, would descend to her heirs. Nor is the common sense understanding of its meaning in conflict with the construction already given to it by the courts. The court of appeals in *Darby* v. *Callaghan*, (*supra*,) in speaking of the language used in this section of the statute, say: "These terms embrace every species of property known to the law." If, then, every species of property known to the law, is by this new creation conferred upon the married woman, it is difficult to see, when no interest whatever therein is given to any other, how such other can claim it. There is no other statute "*in pari materia*," to be construed with it. There are no reservations of the rights of others, contained in it; it interferes with no vested rights, because it is prospective. There are no rights obtained by the marriage contract which are affected or impaired by it, for all these rights stand upon the foundations of positive law. (4 *Selden*, 114.) But this statute depends not upon itself alone—upon its own simple, plain provisions—upon the common sense understanding which its own clear phraseology demands for construction and the intent to be derived from its terms. The courts generally have also been prompt to sustain its *intent*. In the case of *Colvin* v. *Currier*, decided at general term, in the 7th judicial district, (22 *Barb*. 382,) E. Darwin Smith, J., says: "The acts of 1848 and 1849, were statutes passed in furtherance of the

policy of relaxing the strict rules of the common law in respect to married women. Those acts repeal the common law rules giving the husband a right to the personal property of the wife, and *a freehold interest in her estate of inheritance,* and subjecting the same to the payment of his debts. *These acts were designed to take away the marital rights of the husband in respect to such property of the wife.* The evil complained of was the too great subjection of the property of the wife at common law, to the control of the husband, and his creditors."

It is argued that these statutes must be construed with reference to the law as it existed at the time of their passage, and that the rights of husbands as they existed before the passage of these acts, are, by the rules of construction, to be carried into and incorporated with the provisions of this new law, for the reason that there is no abrogation of such rights in the express language of the statute.

It becomes important then, for the purpose of duly weighing this argument, to inquire what were the respective rights of husbands and wives to estates, prior to the passage of the acts of 1848 and 1849. First, in regard to married women, it may be said that ever since the day of Lord Hardwicke, and even before that time, in the English court of chancery, and also in our own, separate estates of married women, with their right to dispose of them as femes sole, independent of their husbands, have been recognized, and they have been permitted to hold such estates divested of the husband's right, *"jure uxores,"* or by the curtesy, either through the intervention of trustees or without. Sometimes the husband in equity was deemed and constituted such trustee, without having other interest therein. (*Sturgis* v. *Corp,* 13 *Ves.* 190. 1 *Ves. jun.* 517, 303. *Peacock* v. *Monk,* 2 *Vesey,* 190. *Fettiplace* v. *Gorges,* 1 *Ves. jun.* 46. *Bell on the Laws of Property,* 513. *See cases cited by Spencer, C. J., in Jaques* v. *Methodist Epis. Church,* 17 *John.* 578, 9; *North American Coal Co.* v. *Dyett,* 7 *Paige,* 15; 2 *Bright on Husband and Wife,* 214; *Strong*

v. *Skinner*, 4 *Barb.* 546.)    And even a court of law has ex-
tended its protection to the wife against the husband, when
no trustees were appointed in the deed by which her title to
separate property was created ; the court holding that persons
named in a will as trustees of the person from whom she
claimed were also to be considered trustees for her.   (2 *Bright
on Husband and Wife*, 215.)    These separate estates which
the courts of equity have so recognized their right to dispose
of as femes sole, have generally been created either by deed,
devise or marriage settlements.

This class of estates includes vested remainders, and all
other estates of that character, such as estates where there has
been no actual seizin, and estates that would entitle the hus-
band to curtesy.   (4 *Comst.* 28.)    And all such estates pass
by the deed of the wife, with her simple acknowledgment,
without a private examination.   (*Id.*)    All this simplicity of
form, and this exercise of equitable power, has been attained,
not without the severest struggles with the jargon of black
letter lore, and the stale precedents and ancient maxims and
traditions handed down from age to age, derived from the bar-
barous customs of a bygone era.   And notwithstanding the
estate of curtesy is an estate that has ever been favored with
a tenacious and unreasonable partiality by the common law of
. England ; so much so as, even to hold that it existed in trust
estates, where there were no words of exclusion in the devise or
deed creating the estate ; yet as early as the year 1738, Lórd
Hardwicke, one of the most distinguished of English chancel-
lors, held that where, in a settlement, or devise of an estate
to a feme covert, to hold as a feme sole, and to her separate
use, in language clearly expressing the *intent* to exclude the
husband from curtesy and *seizin*, the estate descended directly
to her heirs, and the husband had no interest therein.   (*Rob-
erts* v. *Dixwell*, 1 *Atk.* 607.)    This case was followed by a like
decision in *Hearle* v. *Greenbank*, (3 *Atk.* 695,) decided in 1748.
These two cases, however, were but following the decision of
*Bennett* v. *Davis*, in the year 1725, by the master of the rolls,

under Lord Chancellor King. (2 *P. Wms.* 316.) These de-
cisions have been regarded as law, unshaken by any authority
that I am aware of, to this day. Such then was the law of
equity at the time of the passage of the statutes of 1848 and
1849. In equity, therefore, married women were not only
authorized to hold separate and independent estates, and the
rents, issues and profits thereof, free from any control of their
husbands, but were also authorized to devise and convey the
estates by deed without private examination, untrammeled by
rights *jure uxoris*, or of curtesy. What more, then, is the
effect of these statutes, but to establish as a legal right, with-
out the interposition of the courts, what before was regarded
as a well settled equitable right by their aid, viz: a separate
estate in the wife ? It is just that, no more. For what sen-
sible reason should the distinction exist ? Why shackle and
trammel the estate of a married woman with the expensive
paraphernalia of trustees, and commissions, and deeds of set-
tlement, and agencies, when the same language enacted, in a
plain spoken statute, performs this duty ? Why, when the
two systems of law and equity are to be administered by the
same court, should there be two systems of law controlling the
estates of married women ? Why, in this noon of the 19th
century, and under a free government, are we solemnly warned
against innovations upon the common law as it existed, and
the legal precedents established in the days of the Norman
conqueror ? Did all knowledge exist in the past ? Is the
glory of the ancient common law so dazzling, that the learn-
ing of the present day, and all the attempted reforms upon the
system to meet the wants of the age, are to be regarded as
dangerous experiments ? With melancholy auguries against
progress I have no sympathy. For theories which have no
support but antiquity I have no veneration. For the outcry
against innovation upon the mysterious excellence of the Eng-
lish common law, which I cannot behold, I have no reverence.
I hold an honest, sensible construction of the statute, ac-
cording to its true intent, to be practical wisdom; and that

the spirit of justice, befitting the wants of the age, is the soundest philosophy in a system of law. I regard it as a humiliating admission of intellectual decline, and worse than weak superstition, to assume that all wisdom existed in the former common law of England, or that laws suited to the condition of a free government could only be framed by the ancient inhabitants of Britain, whom Blackstone with fond partiality calls " our Saxon *princes;*" nor do I believe that it is *only* in the annals of *past* ages that we shall look for the wisdom necessary to guide us in our own. As changes are wrought in the circumstances of a people, or country, it is necessary, not only that their laws themselves, but also the spirit of the laws should be accommodated. I bow with willing submission to the shrine of legal reason. I am not opposed to seeing it traced to its sources, nor to explore its earliest teachings ; but " *tempora mutantur et nos mutamur in illis.*"

Having shown the equitable condition, let us next inquire what were the *legal* rights of the husband, in the real estate of the wife, before the passage of the acts for the more effectual protection of married women, and what effect those acts have upon such rights.

At common law, a man by his marriage to a wife who had an inheritance in lands, became possessed of a freehold interest, "*jure uxoris,*" that is, he and his wife became seised of the estate in *her right.* This marriage and *seizin* gave to him a title to the rents and profits during coverture. This estate, according to Lord Coke, he shall receive as " governor of the family." This incipient title he possessed independent of the birth of issue. Indeed the tenancies by the curtesy *initiate* and *consummate,* are but continuations of this first estate. (*Barber* v. *Root,* 10 *Mass. R.* 263.) This primary freehold interest of the husband was assignable by him, and was subject to be taken on execution for his debts. This was an estate enduring for the joint life of himself and wife. Upon birth of a child, the second step towards perfecting it, the estates of tenancy by the curtesy became *vested* and formed the estate

Billings *v.* Baker.

*initiate;* and thirdly, by the wife's death it became *consummate.* The husband then had the whole estate for his life. Each of these two latter estates, like the first, were alienable by him, and were liable on execution for his debts. So that from the time of marriage, the wife lost all power and control over her estate, both in the freehold and in the *inheritance,* during his life. In this view it will be seen that the whole estate, freehold and inheritance, which had all equally and in an undivided unity, been *the estate of the wife,* was by marriage, and its consequences, no longer practically the *property of the wife,* but was severed into parts, and formed into different and distinct estates, neither one of which estates could she, ever again, during his life, enjoy or control.

Taking this view of the loss, in effect, of her whole estate—of her unjust, unnatural exclusion therefrom, and her consequent helpless condition—it furnishes, in my judgment, a sufficient explanation for the form or style of the title of the statutes in question, to which much of the argument was devoted; and sufficiently shows that *the* estates which these statutes were intended to protect, *is the estate,* which, except for her marriage, would be entirely her's, but which *by* her marriage, she would, in effect, entirely lose. The process of reasoning by which it is demonstrated that an act which refers to this estate as " the property of married women," by one general term, plain to the commonest understanding, can be construed to mean a *divided* portion of it, to wit, an estate in her during her life, I cannot appreciate. Why is it, if this *divided* portion of her property, only, was meant, that this plain spoken statute did not say so in terms ? True, there might have been added to the title the words " and to restore them to their natural rights," but it was far better to have that provision in the body of the act, than in the title. The title is no part of the act, and can never be used to control or restrain any positive provision of the act.

But is it not the whole estate that this statute permits a married woman to take ? And is it not this whole estate that

the statute is to protect? Would not the words of this statute, if made applicable to males, confer on them the whole estate? Do they confer less when made applicable to females? Are words of *inheritance,* necessary to be expressed, in order either to create an estate, or to entitle heirs to inherit from her? On the contrary, is it not now a provision of our revised statutes that the whole fee passes, unless the intent to pass a less estate shall appear in express terms? (1 *R. S.* 748.)

Thus stood the common law of England in relation to such *legal* estates, and thus it became the common law of this country, first by adoption, and next by a statute recognizing its existence, (1 *R. S.* 754, § 20,) when the acts for the more effectual protection of married women were passed, in 1848 and 1849. These acts, we may safely assume, were *intended* by the legislature to effect *some* change, in regard to the estates of married women, or they would not have been passed. What changes they did effect are now questions for the courts. They could work *no* changes upon *existing* estates. The rights as to them, had become *vested.* (*Westervelt* v. *Gregg,* 2 *Kern.* 211.) They must therefore apply to prospective estates, according to the general rule of construing statutes. Indeed it may be said as a necessity that they *must* apply to the *future;* for at the time of the passage of those acts, it can hardly be said that a *married woman* had any legal estate that she could call her own, to which they could apply. Her personal estate, on her marriage, became her husband's absolutely. The rents and profits of her real estate, as we have seen, became his during coverture, and by the birth of a child he took a *vested* estate. These rights of the husband all came by the English common law adopted here; not one of them is either a natural or a moral right of the husband, or was ever conferred by any statute of this state; nor are they embraced in or conferred by the marriage contract. These estates of the husband, by the common law, were made incidents of the marriage contract. This contract and the subsequent birth of a child, were the *conditions* upon which these estates

came into existence, but they all stood upon the foundations of positive law, and are no part of the marriage contract itself, (*Moore* v. *The Mayor of New York*, 4 *Selden* 114;) and they were all, therefore, within the power of the legislature to control and modify at their pleasure. (*Sleight* v. *Read*, 18 *Barb.* 159.) And even the contingency that the legislature might interfere and alter these rights, is one of the ingredients of the marriage contract. (*Id.*) To what extent then, have these unnatural rights been changed, and the natural rights of women restored? To what "property of married women" do these statutes apply? This was one of the leading questions on the argument. It appears to me that the plainest exercise of the faculty of common sense dictates the answer. It is the *property* referred to in the provisions of the same statute. It is the property which she held *absolutely* before marriage. It is *the property* which she may in like manner take by inheritance, gift, grant or devise, after marriage. It is the *property* which she may hold to her sole and *separate* use. It is *the property* which she *alone* has power to convey and devise. It is *the property*, real and personal, (without distinction made between them) and any interest or estate therein, and the rents, issues and profits thereof, *which she alone may convey and devise, in the same manner and with like effect*, as if she were unmarried. It is *the property* which shall not be subject to the disposal of her husband, nor be liable for his debts. This is the property of married women, most undoubtedly, that is referred to in the title. She may convey "*any interest therein*," says the statute. Could she do this if her husband had *curtesy* therein? Could she convey his *vested estate?* To entitle her to *convey* with the same effect as an unmarried female, must she not *hold* the same interest therein as if she was an unmarried female? Can she convey the *whole estate* with the same effect, if she does not *hold* the whole of it? If she *holds* the *whole* estate, where is his curtesy? It was not claimed on the argument that the statute intended to make any distinction in the tenure or man-

ner of holding estates after marriage, between such property as was owned by a single female before her marriage, and such as was or should be inherited or acquired by a woman after marriage. I think it is fair to assume that no distinction was intended by the statute. In looking at the 1st section of the act of 1848, it is found that the property, real and personal, of a single female who may thereafter marry, "shall *continue her* sole and separate property as if she were a single female." What estate had she that should continue? Was it not the *whole* estate? These words furnish a key to the *intent* of this statute. Neither the word " *continue,*" nor the words "*her sole and separate property,*" in my judgment, can be tortured into a construction that takes from her any part, or that would give the husband a vested estate, or any estate therein. The learned counsel for the appellants, while they concede that though these statutes have wrought *some* change in the law, insist, still, that the right to curtesy is not thereby abrogated. But as I understand the argument, *this change* they do concede, that by these statutes, the wife during her life does possess the free and absolute power, independent of her husband, to devise or convey the real estate she had, or may acquire, *absolutely and in fee,* divested of any interest, present or future, that the husband has, or may have therein; and that the birth of a child during coverture, does not cut off or abridge this absolute right of the wife. This is conceding no more than the language of the statute in terms, demands; it is conceding no more than is held in *Hurd* v. *Case,* and *Clark* v. *Clark,* which are relied upon as authority. How then stands the estate of curtesy? Emasculated, as this concession *would make it,* it cannot stand alone for one moment. It cannot be an estate of curtesy, if wanting those qualities upon which alone it depends for its existence. This estate, (like other estates) must have a beginning. It must have a time to vest. If it has neither a beginning nor a time of vesting, how does it exist? If these statutes have *not abrogated or* interfered with it, it vests, as it ever did, upon the birth of

issue, and begins in the lifetime of the wife. If they have interfered with it, when then does it vest or begin? There *must* be a *time* when it vests. Titles to estates are never in abeyance; the title is always in some body. (*Jackson* v *Catlin*, 2 *John* 248. 2 *Caines*, 61.) When then does it vest? Ever since the day of its feudal paternity, it vested at the birth of issue. These statutes have not attempted to change the time of its vesting.

The *initiate* estate of curtesy, in our own courts, has been held a sufficient estate to recover upon, in an action of ejectment. In *Jackson* v. *Johnson*, (5 *Cowen*, 95,) in an action of ejectment, decided in 1825, Sutherland, J., says: "It is clear that the birth of a child, at any time during the coverture, whether before or after the defendant's possession, would constitute Cooper tenant by the curtesy of all the lands of his wife, of which, during the coverture, she was so seised, as to support such an estate." In a later case in the court of chancery of this state, (*Ellsworth* v. *Cook*, 8 *Paige*, 643,) a married woman's real estate had been sold on a decree in partition, and a creditor's bill was filed, by a creditor of her husband, to reach the husband's interest in the fund, as tenant by the curtesy, and there was a question raised as to whether there had been such a *seizin* as to entitle to curtesy." Chancellor Walworth said: "I am satisfied that he had such a *seizin* in this case, of two-thirds of his wife's share of the premises, as to make him a *tenant by the curtesy initiate,* so as to entitle him to a *continuance* of his estate in those two-thirds during the whole period of his own life, in case he survived his wife." This case is of equal authority perhaps to that of any other. The time of the vesting of this estate, does not appear to me to be an open question. If the estate has not been abrogated, the time of vesting has not been changed. Our revised statutes have fixed the time of its vesting to be as we have claimed it. At the birth of issue, the husband is then, in the language of the statute, in a condition that the estate vests. (1 *R. S.* 723, § 13.) "An estate is vested when there is a person in

being who would have an immediate right to the possession upon the ceasing of the intermediate or precedent estate." The estate for his life then vests in the husband, and the remainder then and at the same moment vests in·the heir ; he can only have it consummate and absolute by the estate of the wife ceasing. The heir can only enjoy, by the ceasing of the estates of both. (*Sumner* v. *Patridge*, 2 *Atk.* 47.)

What kind of estate of curtesy then, would that be, that the wife at her will and pleasure, can convey, devise and destroy? If it is *vested* she cannot destroy it. In regard to this estate, perhaps no one question is better settled than this : that from the time of the *vesting* of the estate by marriage, seizin and the birth of issue, it becomes a right inseparable from the inheritance, that cannot be restrained, prevented or destroyed, by the act of the wife or of any other person, or by any proviso or condition. (*Greenl. Cruise, tit. Curtesy,* ·p. 153, § 17, *marginal paging* 143. *Paine's case,* 8 *Rep.* 34. *Mildmay's case,* 6 *id.* 41.) And Hilliard, an American writer of high reputation, on real estate, says : "that by the birth of issue, the husband gains an *initiate title,* which cannot afterwards be divested by act of God." (1 *Hill. on Real Estate, p.* 79, § 22.) As in dower, no act of the husband can divest his wife of her estate, after *marriag e*and *seizin,* so in curtesy, no act of the wife could defeat curtesy after it becomes *vested* by *marriage, seizin* and *birth of issue;* nor did even adultery forfeit this estate as it did the estate of dower. I have searched the books in vain to find authority for an estate of curtesy, which depends on the volition or act of the wife. Such a quality is no part of the definition of an estate by the curtesy of England. If it now possesses such a quality, it is an estate by the curtesy of New York, and not of England ; and its definition and character are yet to be made and written in the books. I think the conclusion irresistibly follows, that a statute which allows the wife to sell and convey perfect title to real estate, during coverture, after seizin and birth of issue, with *like effect as if she was unmarried,* has abro-

Billings *v.* Baker.

gated the estate of curtesy therein.   Or if it shall be held that it has only been modified, it is so far modified that it has not the dignity of an estate even equal to that of a chattel real, and could not be levied upon or sold on execution.   If it exists even in the modified, meager skeleton of its former self, which the argument concedes, its ghostly image seems incapable of description, and it has not essence enough left, *"per se,"* to entitle it to respect, sufficient to make its proprietor a party to an action.   I hold it to be nothing less than an absurdity to say that a statute that has destroyed the power of this estate to vest, has not also destroyed the estate.   To sustain the position that this estate is not abrogated, it is absolutely necessary to establish, either first, that all the old law writers were mistaken in fixing the time of the vesting of the estate to be at the birth of issue; or second, that the acts of 1848 and 1849 have so far modified the common law as to change the time of its *vesting;* or thirdly, what is still more absurd, that the wife at her will and pleasure can alienate and destroy a vested estate that exists in the husband.

But still another insurmountable difficulty arises to the claimant of curtesy, since these statutes.   To entitle him to this estate, he must have been *seised* of the estate *"jure uxoris"* during the life of his wife—not merely a seizin in law, but a seizin in deed; (*Co. Litt.* 29 *a;*) hat is, *actual* possession as distinguished from the right to possession.   Formerly, the actual seizin of the wife created a freehold estate in him, and he was thereby seised in her right, and when the estate of curtesy vested, he continued the inheritance by virtue of his seizin.   Now any seizin by him during the life of the wife, is an impossibility.   In the case of *Hcarle v. Greenbank,* (3 *Atk.* 695,) Lord Hardwicke held that, because the husband had no seizin either in law or equity, *during the coverture,* he was therefore not entitled to curtesy.   In *Bac. Abr. tit. Curtesy,* it is laid down, " the wife must have such an interest, that her husband may have seizin or possession in the nature of a seizin in *her right.* (*Hill. on Real Prop.* 76.   1 *Cruise,*

108, § 10. 1 *Inst.* 29 *a.* 1 *How. U. S. Rep.* 54, 5. *Adair* v. *Lott*, 3 *Hill*, 182.)

There is but one other feature in this case that I design to notice by way of answer to the argument of the plaintiff's counsel. It is this; "that inasmuch as there are no words, in these statutes, of express exclusion of the husband's curtesy in terms, their rights remain precisely as they did at common law under an executory trust estate, created for the sole and separate use of the wife for life, without words of exclusion of the husband in the inheritance. That if the trust was *executed*, so that the inheritance *vested* in the wife, the husband had curtesy; and if the trust was *executory*, the title remaining in the trustees, to be conveyed to the heirs of her body at her death, then the husband had no curtesy." Such I concede was the common law, even here, prior to these statutes; and *Roberts* v. *Dixwell*, (*supra*,) proves this to be so; and the reason given for the decision in that case by Lord Hardwicke, I think is the same that should determine this question, to wit: *That during the coverture there was no seizin in the husband and wife.* And *Coke upon Littleton*, 30 *a*, was cited in that case to show that the husband must have some right in the lifetime of his wife, to entitle him to curtesy, because the estate of curtesy commences in her lifetime and *not at her death;* because, says Lord Hardwicke, citing with approbation the law as above, "My Lord Coke says, that to make a tenancy by the curtesy, there ought to be a right in the husband inchoate in the life of the wife." (1 *Atkyns*, 609.) These statutes execute their own purpose. Trustees are dispensed with, and husbands excluded. The machinery is simple, the intent clear.

From the influences of such considerations, I held before, and seeing no reason to change those views, I hold now, that our natural progress in knowledge and intelligence, our advanced social and political condition, our changed system of government, our better and more full appreciation of equal and natural rights of every class and condition of citizens,

presented a reason, and I thought and still think, a *necessity*, for the passage of an act for the eradication of this unnatural and worse than useless tenure, called curtesy, as one of the vestiges of a bygone, military age, which had too long remained an excrescence upon our system of law, based as we claim it to be, upon the theory of an equality of natural rights. In my judgment, the provisions of these statutes, of 1848 and 1849, are aptly fitted, and were intended to effect, a radical change in relation to those tenures; that they introduced changes more suited to the necessities of the times, and to the present condition of parties; and that such a change was demanded by the highest considerations of public policy; was dictated by the soundest views of justice, and rested on a substantial basis of good sense.

In my former opinion I took the position that before the passage of these statutes, where it was the evident *intent* in making a settlement of an estate upon a married woman, that she was to hold it as a *feme sole*, the husband could not have curtesy; and I cited *Hearle* v. *Greenbank*, (3 *Atk.* 695,) to prove that proposition. Upon more examination, I hold that case to be undoubted law. It would be indeed a monstrous doctrine for the courts to publish to the world in this day, that this estate of curtesy possesses "*per se*" such a subtle, inveterate, yet mysterious tenacity of existence, that by no *intent* of parties, by no power of language that can be employed in deed or statute, can an estate be created free from its anomalous power; and yet the argument of the appellant's counsel verges upon this absurdity. In the most thorough review that I have been able to give to the cases of authority cited on this question, I have experienced no such embarrassment or difficulty as was insisted on, of a conflict of authority. Instead of finding the case of *Hearle* v. *Greenbank* overruled, or even doubted as authority, or that there existed any conflict of cases with it, upon the point for which it was used, (as was alleged,) I find it not only abundantly, but in every subsequent case, fully fortified and sustained. Neither Sir John

Leach, as vice chancellor, in *Morgan* v. *Morgan*, (5 *Mad.* 249,) nor Chancellor Kent in his *Commentaries*, (*vol. 4, p.* 31,) raises a question of doubt, or gets up a conflict upon *that* point, as we shall presently see.   Upon examination, also, the case of *Roberts* v. *Dixwell*, (1 *Atk.* 606,) instead of deciding the case "the other way," as counsel insisted, on the argument, decides it exactly the same way.   The supposed conflict of *cases*, was upon another question in the case, to wit; the question whether a husband was entitled to curtesy in a trust estate at all, and to a supposed distinction existing .between an *executory* trust estate, and an executed trust estate.   There was for a long time a doubt, and a struggle had been going on in the courts of equity upon that question.   But upon the question of the effect of the testator's *intent* thus to cut off curtesy, there was no conflict of opinion in the cases cited, and there has been no conflict since, that I am aware.   Let us now first look at the case of *Roberts* v. *Dixwell*, (1 *Atk.* 607.)   In that case Sir Thomas Sandys directed his trustees to convey a full fourth part of all his freehold lands, &c. to the use of his daughter Priscilla, for life, *and so as she alone,* or such person as she shall appoint, *take and receive the rents and profits thereof, and so as her husband is not* to intermeddle therewith," and from and after her decease, in trust for the heirs of her body forever."   After discussing the difference between *executory* and *executed* trusts, Lord Hardwicke, upon the question of *intent*, came to this conclusion.   He says, "It is plainly the *intention* of the testator that the husband should have no manner of benefit from the estate, either in the lifetime of the wife, or after her decease ; *the husband of consequence is absolutely excluded.*"   Here, it will be seen, the decision turned upon the question of *intention* of the testator. Now let us look at *Hearle* v. *Greenbank.*   In that case the testator devised his real estate, and the rents, issues and profits thereof, " *to and for the sole and separate use of his daughter Mary,* wife of William Winsmore, during her life, *and at her disposal, and not to be subject to the power or control of her*

*said husband."* Lord Hardwicke again held, in this case,
*" that neither in law or equity, was the husband tenant by the
curtesy; to admit there was curtesy, would be directly con-
trary to the father's intention."* Is there any thing to be
reconciled between these two cases, upon this point? I con-
fess I have seen nothing but harmony in this particular. The
learned counsel who insisted upon the argument, that *Roberts*
v. *Dixwell* had been decided exactly the other way from *Hearle*
v. *Greenbank,* had probably not read the case itself, but had
most probably read the remark from Chancellor Kent, refer-
ring, not to *that,* but to an entirely different question, arising
in the case, to wit, the question whether curtesy existed in an
*executory* trust. The case of *Morgan* v. *Morgan,* (5 *Mad.*
249,) cited as overruling *Hearle* v. *Greenbank,* upon examina-
tion, is found not at all in conflict with it. In that case there
were no words of express *exclusion* of the husband in the trust.
Had it even been found in conflict, the opinion of *Vice* Chan-
cellor Sir John Leach would hardly be regarded as authority,
when coming in conflict with that of Lord Hardwicke, chan-
cellor. But the case actually sustains, instead of being in
conflict with *Hearle* v. *Greenbank.* In that case, Sir John
Leach admits that he would have acted according to the *inten-
tion* of the settlement, but the intention not being *expressed,*
he decides the case upon the ground that the husband was
not *wholly excluded* by the terms of the settlement. And he
further admits that a husband would be *wholly excluded* from
curtesy, by a provision that the *inheritance* shall descend to
the heirs upon the death *of the wife.* It is therefore an au-
thority sustaining *Hearle* v. *Greenbank.* His dictum in that
case, that *Hearle* v. *Greenbank* and *Roberts* v. *Dixwell* could
not be reconciled, did not, as will be thus seen, at all refer to
the question of *curtesy,* when the *intent* to exclude it was
manifest, but only to the general principle, that a husband
would have curtesy in the *equitable* as well as *legal* inherit-
ance of the wife, even though the rents and profits during her
life were directed to be paid to her. The case of *Bennett* v.

*Davis,* (2 *P. Wms.* 316,) has never been doubted as authority, that I am aware of; but on the contrary, it is cited with approbation in all the above cases, and especially by Chancellor Kent in his discussion of this question, which the counsel erroneously cited as authority the other way. I regard this case as conclusive upon the point. This is the statement of the case: J. S. married his daughter to one Bennett, a tradesman in London, who was an extravagant spendthrift, and in debt. The father made a will, and devised his land in fee to his daughter (the wife of Bennett) *for her separate and peculiar use, exclusive of her husband, to hold* the same to her and to her heirs, and that her husband should not be tenant by the curtesy. The father died, the husband became bankrupt, the commissioners of bankruptcy claimed to take the estate from the wife and children, to pay the husband's debts out of his estate of *curtesy* therein. It was argued in that case, as in this, that *as matter of law,* the husband had *curtesy in his wife's estate, notwithstanding her father's intent;* and that the settlement so made by the father was repugnant to law. The court thought otherwise, and held that there was no difference between an estate created by the *act* of the *party,* and one *created by act of law,* and that the intention of the testator should control.

In my former opinion, I placed my decision substantially upon the ground that the *intent* of a remedial statute, in relation to the estates of married women, should be construed in the same manner as the *intent* of a devise, marriage settlement, or trust estate, created for the same purpose, if the language was either identical, or the same in substance; and that the manifest *intent* in both, should be the criterion to determine. The cases above cited, it will be seen, fully sustain that position. These cases could be multiplied if necessary; let one other suffice, which contains the substance of all. In *Stanton v. Hale,* (2 *Russ. & Mylne,* 175,) Lord Chancellor Brougham said: " It was clear that no particular form of words was necessary, in order to vest property in a married woman, to her

Billings *v.* Baker.

separate use; that *intention*, though not expressed in terms, might still be inferred from the nature of the provisions annexed to the gift; as where, for example, the direction was that the property should be *at the wife's own disposal*, or that her receipts should be a good discharge, circumstances which raised a manifest implication, *that the marital right was meant to be excluded.*"   Whether we look at the uninterrupted chain of adjudications by the courts, upon deeds, settlements, and agreements for that purpose, or upon the like language in a statute creating the estate, the *intent* is the controlling feature that is to determine its meaning.   Indeed the legislature, as if jealous that the courts might depart from this just rule, that *intent* should govern construction, have incorporated it as a permanent provision in the statute, (1 *R. S.* 748,) as follows: "In the construction of every instrument creating or conveying, or authorizing the creation or conveyance of an estate or interest in lands, it shall be the duty of courts of justice to carry into effect the *intent* of the parties, so far as such *intent* can be collected from the whole instrument, and is consistent with rules of law."   If then such or equivalent words are used in a statute conferring estates upon married women, must not the same *intent* be held to follow as in the language of an agreement?   If the words used in this statute had been found in any devise, or marriage settlement, that has ever been before a court of equity since the days of Hardwicke and Eldon, it would have been adjudged sufficient to confer not only a separate estate, for the sole and separate use of the beneficiary, but also one that would exclude curtesy.   Not only are there negative words enough contained in it, to exclude every idea of there being the rights of others covertly remaining within its meaning, but there is also the positive power, incident to all absolute estates, the "*jus disponendi.*" "Property," says Lord Thurlow, in *Fettiplace* v. *George*, (1 *Ves. jun.* 49,) "the moment it can be enjoyed, must be enjoyed with all its incidents."   It is a rule of common law, that the power of alienation is an inseparable incident to the right

of property, for the common law knows no such anomaly as a right of property without the absolute and universal power of disposal. (*Bell on Husband and Wife*, 504.) When married women are allowed to enjoy property independently of their husbands, the privilege necessarily implies a "*jus disponendi.*" (*McQueen on Husband and Wife*, 294.)

Still another argument against this view of the statute has been most strenuously insisted on, upon the argument; that is, if it had been the intent of the legislature to have changed or abrogated the common law, or to have cut off the husband's curtesy, they would have so declared in terms, in the statute itself. Such an argument has its force, and is to be duly weighed. It has less force, however, when applied to a *remedial* statute, than it might to some others. But this argument, when applied to this statute, proves far too much ; for in the very argument submitted, the learned counsel admit that it has abrogated a part of the common law in relation to this same estate, to wit : that the incidents of enjoyment and alienability, during the life of the wife at least, are entirely cut off, and yet did not say so in terms. "But the courts have already gone far beyond this concession of the counsel, and we are not at liberty to overrule it. In *Blood* v. *Humphrey*, (17 *Barb.* 662,) the general term of the 6th district have held that those statutes of 1848 and 1849, have not only repealed so much of the revised statutes as require a married woman in making an acknowledgment of a deed to be examined separately, if the deed relates to estates acquired since that law, but they also held that they have abrogated much of the prior common law in regard to *their rights.* Mason, J. says : "The legislature *intended* to remove the entire disability, which both the common law and the statute had thrown around married women, not only as regards their right to take and hold, free and independent of their husbands, but also to remove the obstacles which the law had interposed against their conveying both by grant and devise, and to place them, so far as the lands which they hold in

Blilings *v.* Baker.

their own right are concerned, on the *same basis precisely as unmarried females."* This, it seems to me, is a full answer to this last position of the plaintiff's counsel, and it also appears to me to contain a pretty satisfactory answer to the whole argument.

If, then, the position is sound that the *intent* of a remedial statute for a given purpose, and the *intent* of a devise or agreement to effect the same purpose are alike controlling in giving them construction, and if identical or equivalent language is to be held to mean the same thing in each, then these statutes which assimilate these two estates of equity and of law, and establish thereupon one uniform and equal basis, exempt from the technical embarrassments which have so long been tolerated from veneration of ancient forms and precedents, should receive from the court such construction as shall give full effect and operation to their provisions, and so that their design and object be not evaded, and when superadded to this, the statutes are found to establish benevolent provisions, such as are consistent with the demands of an enlightened and progressive age, in harmony with the long continued efforts of the courts to mitigate in some degree the inequalities and injustice of the common law in relation to married women and their immediate heirs, and to prevent the squandering of their estates by improvident husbands, it should be the willing duty of the courts to sustain and give efficiency to their just and equitable provisions. They should enter upon the duty of its construction, with the same remedial spirit in which the legislature entered upon their duty of enacting the law, by discarding all the unnatural maxims and precedents and clogs to progress. Thus sustaining its letter and intent, it will become a kind of magna charta, in the restoration of natural rights, too long and too unreasonably withheld.

Having come to the conclusions above expressed, after a careful consideration of the arguments presented, and the authorities to which I have had access, I have been unable

to change the conclusions at which I before arrived. I cannot hold that a *remedial* statute, whose letter and title declare its design to be, protection of the estates of *married women,* shall by construction, not warranted by its language, be made to protect their *husbands,* and to give to the latter an estate which all elementary writers declare that they have neither a natural, nor a moral right to hold.

The order of the special term should be affirmed.

ROSEKRANS, J., dissented.

Order affirmed.

[SARATOGA SPECIAL TERM, January 19, 1858. *Potter,* Justice; and SCHE-NECTADY GENERAL TERM, January 4, 1859. *C. L. Allen, James, Rosekrans* and *Potter,* Justices.]