## Elizabeth Tong, by next friend, v. Percy Marvin and others.

*Fraud, when allegations of, sufficient: What facts necessary to state.* The bill in this case alleged that the mother of complainant being seized of certain real estate in Michigan, died in 1857, leaving her husband, Proctor Tong, and the complainant (who was then seven years old) her sole heir at law; that a mortgage upon said premises had been foreclosed by advertisement during said year, and the land sold, for about $700; that one Daniel Marvin, father of defendants, desiring to own said land, obtained a quit claim deed thereof from complainant's father, by false and fraudulent representations, and afterwards procured the appointment of his son Lucius Marvin as guardian for complainant, to have her interest in the premises sold; that he then loaned said Lucius sufficient money to redeem said premises from said foreclosure; that said land was afterwards sold at guardian sale and bid off by said Daniel for the sum of $925; the real value being $2,000 and over; and that the acts of said guardian originated with, and were directed by said Daniel Marvin for the purpose of enabling him to become the purchaser of said land below its true value. *Held,*

   1.   That said allegations, if sustained by evidence, made out a case of legal fraud.

   2.   Equity must have regard to the effect of false and fraudulent statements, rather than to the person to whom they are made.

   3.   Where allegations of fraud are stated in a bill, it is not necessary that the facts and circumstances which tend to establish the fraud should be detailed. Where the facts which constitute the fraud are set forth with an averment of the injurious result, the case is sufficiently made by the pleadings, and a detail of the circumstances which tend to establish a dishonest intent in defendant's action is more properly left to the evidence.

*Tenancy by the Curtesy, repeal of.* The acts of 1844, 1846 and 1855 relative to the protection of the rights of married women, together with the constitutional provision on the same subject, entirely abrogate the existence of prospective tenancy by the curtesy. Every quality and incident that is necessary to constitute such a tenancy is destroyed by the provisions of these acts.

*Heard October 19th, 20th. Decided November 8th.*

Appeal from Huron Circuit in Chancery.

The bill in this cause was filed by complainant, through her next friend, against her guardian, Lucius Marvin and other defendants, charging fraud in the sale of certain real estate, and praying that the same might be set aside.

The bill also prayed that a certain deed of the premises obtained from her father by the purchaser at a certain guardian sale through fraudulent representations might

be set aside, and the title thereto declared to be vested in her.

Defendants demurred to the bill.

The demurrer was sustained, and the bill dismissed.

The facts necessary to an understanding of the cause appear in the opinion.

*Wm. L. Webber* for complainant.

1. The deed of Proctor Tong of June 1st, 1857, conveyed no title. He had not an estate by the curtesy in the land.

*a.* The statute of 1855, for the benefit of married women, in connection with the constitutional provision and other legislation on the subject, has repealed the old statute which gave an estate by the curtesy. The real estate of the wife continues to be hers, and may be disposed of, as if she were unmarried. Under the old statute she could not devise it so as to prevent curtesy. If she may do so now, the old statute is changed in that respect; and there can be no curtesy *initiate* before the death of the wife, nor *consummate* on her death; but her estate descends, in the absence of a will, free from curtesy, the same as her devise would do, if she had made a will. By the former law, as the wife could not sell without her husband's consent, so she could not deprive him of his curtesy, but now it is at her option whether she will convey in her life time or devise the same, and it would be strange indeed, if the estate by the curtesy should depend on the mere accident of will or no will.

*b.* The mortgage was made April 16th, A. D. 1839, and was due April 16th, A. D. 1842. By the law as it then stood the mortgagee held the title. When in 1845 Timothy L. Howe died, Thaddeus, and after him in 1855, Olive B. his mother inherited a mere right to

redeem; she was not seized of the land, and the mortgage was in full force, and the title remained in the mortgagee until after her death in 1857. To Elizabeth descended a mere right to redeem, to which curtesy could not attach. 2 *Comp. L.* § 2803.

c. If Proctor Tong had an estate by the curtesy, by making the deed to Daniel Marvin, he forfeited his entire estate, and Elizabeth had an immediate right of entry. — 21 *Me.* 372; 1 *Greenlf. Cruise, Tit. V. Chap.* 2, § 31.

2. But even if the deed of Tong did convey a life estate to Marvin, it affords no reason why this bill should be dismissed. It goes only to the extent of the relief. The guardian's deed should be set aside, in order that when the life estate shall cease, the complainant's estate in fee may be clear from any and all incumbrance.

*Mitchell & Farrand,* for defendants.

1. It appears by the bill, that Proctor Tong, the guardian, had the actual right to the present possession of the land, as tenant by the curtesy; and if so, the complainant has no present right that she can enforce by bill or otherwise. He being tenant by the curtesy, her right must remain in abeyance, until his death; and until then she has no more right with, or control over the land, than a mere stranger, and certainly no possessory right. — *Comp. L.* § 2803 *and* 3291.

The husband, Proctor Tong, being tenant by the curtesy, had a full right to convey, as the bill states he did, his life estate to the ancestors of the defendant. — 2 *Mich.* 93.

Proctor Tong, the tenant by the curtesy, having conveyed his rights to the ancestor of the defendants, neither the complainant or any one else can interfere with their possession, or possessory rights during his life.

He alone can take advantage of any fraud in that conveyance.

2. While the bill assumes fraud, it makes no statement of facts showing fraud, or out of which fraud may be presumed. The mere charge or statement of fraud, or fraudulent intent, without a statement of facts of themselves, showing fraud or fraudulent intent, is not sufficient. There must be something more than assumption or presumption.

The mere allegation that the deed was procured from Proctor Tong, fraudulently, is of no avail, without showing in what the fraud consisted. But even if it was fraudulent, as to him, the complainant cannot take advantage of it.

There is no fraud alleged in procuring the guardianship, and no intent of fraud charged in executing the guardianship. — 3 *Mich.* 531.


COOLEY J.

The demurrer in this case is supposed to be sustainable on two grounds: 1. That the bill, in charging fraud, merely sets forth conclusions, without giving such facts as would warrant the conclusions: 2. That even admitting the case made by the bill to be true, the complainant is not entitled to relief, inasmuch as the outstanding life estate of Proctor Tong, as tenant by the curtesy, has become vested in the defendants by means of the quit claim deed to Daniel Marvin.

The bill, in order to show fraud, recites the following facts: That the mother of complainant, being seized of the title to the land in controversy, died in 1857, leaving surviving her, Proctor Tong her husband, and this complainant, her sole heir at law, both residing in the state of New York; that the premises, which are situate in Huron county, were at that time subject to a mortgage, which was foreclosed by advertisement June 9, 1857, and the land sold for $675 93; that Daniel Marvin was

desirous of becoming the owner of said land, and of depriving complainant thereof, and for that purpose procured an order from the Probate Court of Tuscola county — to which Huron was then attached — appointing his son, Lucius S. Marvin, guardian for complainant; that he then loaned said Lucius the money to redeem the premises from said foreclosure sale; that thereupon said Lucius petitioned the Probate Court for license to sell said lands, representing that complainant had no other property out of which he could be reimbursed said redemption moneys; that license was granted for that purpose, and a sale made August 7, 1858, to said Daniel Marvin for the sum of $925; that a report of sale was made, showing the expenses to have been $204.19, which, together with the redemption moneys, exceeded the sum for which the land was sold; that the premises at that time were worth more than $2,000, and that the proceedings of said Lucius S. Marvin, pretending to act as guardian for complainant, were originated and directed by the said Daniel Marvin for his own benefit, and for the purpose of enabling him, the said Daniel, to become the purchaser of said land at a price much less than its true value, and thus to defraud complainant. The bill also alleges that said Daniel, before he caused such appointment to be made, applied to said Proctor Tong, represented to him that said land was of little value and not worth redeeming from said mortgage, and by means of these and other false and fraudulent representations, procured from him a quit claim deed of said premises, bearing date June 1, 1857. The complainant at this time was seven years of age.

We have no doubt that these allegations, if sustained by the evidence, make out a case of legal fraud. The false representations made to the father, by means of which a release of his supposed interest was obtained, had a direct tendency to induce the natural guardian of

complainant to abandon all care for her interest in the land, and are equivalent, in the situation in which she then was, to ·false representations made directly to the person to be defrauded, when such person is capable of managing his own affairs. Equity must have regard to the effect of false and fraudulent statements, rather than to the person to whom they are made; and in most cases where a minor of this tender age is defrauded, it is only accomplished by operating upon friends and natural protectors.

But if the original transaction was, as is alleged in the bill, originated and carried through by Daniel Marvin for the purpose of obtaining complainant's land, at an inadequate price, and the guardian was a mere instrument in his hands for that purpose, not acting at all in the interest of complainant, but solely in that of Daniel Marvin, we think a fraud both upon complainant and upon the law has been committed, which requires the intervention of equity. It is not, however, necessary that the facts and circumstances which tend to establish the fraud should be detailed in the bill. Where the facts which constitute the fraud are set forth, with an averment of their injurious result, the case is sufficiently made by the pleadings, and a detail of the circumstances which tend to establish a dishonest intent in defendant's action, is more properly left to the evidence. — *Story Eq. Pl.* § 252 *and cases cited.*

The principal question in the case, however, is whether Proctor Tong, the father of complainant, had an estate by the curtesy which was conveyed to Daniel Marvin by his deed of June 1, 1857. This question depends mainly upon the proper construction of the statutes of 1844, 1846 and 1855, relative to the property and rights of married women, and the constitutional provision on the same subject.

And in approaching this subject we have earnestly endeavored to arrive at the true meaning of the Legislature and of the people in adopting these several provisions, that

we may give effect to their intention if possible. We have not felt ourselves at liberty to question, with any speculations of our own, the wisdom of the policy adopted in this state relative to the rights of married women, and we should feel conscious of usurping powers which properly belong to another department of the government, if, instead of giving effect to a plain declaration of legislative will, we should endeavor to apply arbitrary rules of construction, and thereby put upon the laws a forced and unnatural meaning with a view to making them correspond to some standard of our own, instead of that which has been adopted by the law-making departments.

The control which a husband has over the person and estate of the wife at the common law is so great and so liable to abuse that it has for a long time been the subject of complaint, and of frequent interposition by courts of equity. He had, 1. The control of her person, and the right to appropriate her earnings to his own use; 2. He became by the marriage the owner of such personal estate as she then possessed, and of all that she should thereafter acquire during coverture; 3. He had a right to reduce her choses in action to possession, and to dispose of her chattel interests in lands to his own use; 4. He became vested with her estates of inheritance during the coverture, and if he survived her, and issue capable of inheriting it had been born to them, he had a life estate therein; and 5. In case of their separation, he had the better right to the control and custody of the children of the marriage. The corresponding rights of the wife were, 1. A right to support, and to have her debts before marriage paid by the husband; and 2. A life interest in the one-third part of his estates of inheritance if she survived him. To these equity added, 3. An equity to a reasonable settlement, to be made from the property brought by her to the husband, for the support of herself and her children.— *Udell v. Kenney*, 3 *Cow.* 590; *Van Duzer v. Van Duzer*, 6 *Paige*, 366.

TONG v. MARVIN.

The act of March 11, 1844, "To define and protect the rights of married women," .made an important change in the rights acquired by the husband by the marriage, without at the same time diminishing his obligations. By this it was provided, "That any estate, real or personal, which may have been acquired by any female before her marriage, either by her own personal industry, or by inheritance, gift, grant or devise, or to which she may at any time hereafter be entitled by inheritance, gift, grant or devise, and the rents, issues, profits and income thereof, shall be and continue the real and personal estate of such female after marriage to the same extent as before marriage, and none of said property shall be liable for the husband's debts or engagements, but such property shall be liable for all the debts of the wife contracted prior to. the marriage."

It will be seen that this statute took away entirely all present right of the husband to the property, real or personal, of the wife, and to the rents and profits thereof. It did not, however, interfere with his common law right to the custody and control of her person, and to her earnings, nor did it expressly vest her with power to dispose of her property without his co-operation. Whether it left him to succeed to any rights in it at her decease is another question.

The provisions of the act of 1844 were incorporated in the Revised Statutes of 1846, in a modified form. Section 25, of Chapter 85, embodies the original act, with a proviso added, "that nothing in this section contained shall be construed to authorize any married woman to give, grant or sell any such real or personal property during coverture, without the consent of her husband, except by order of the Judge of Probate, or the proper court of the county; and provided further, that upon a separation between such husband and wife, saving by an adjudication of court, such married woman shall in no

case be authorized to remove any such property from the premises of her husband without his consent."

The next section (26) gave to the Circuit Court of the proper county concurrent jurisdiction with Chancery in cases arising under § 25, and § 27; provided that " If any married woman shall die without disposing of any such real estate, the husband surviving her shall have a life estate therein by the curtesy." That this section was adopted in reference to § 25, and with a view to restraining what would otherwise be its operation, or at least to put at rest any question on that subject, is apparent from the connection. Another section in the statutes of 1846, — *Ch.* 68, § 1 — empowered married women to dispose of real or personal property by will, with the written consent of their husbands, and still another defined curtesy as follows: " When any man and his wife shall be seized in her right of any estate of inheritance in lands, the husband shall, on the death of his wife, hold the lands for his life as tenant thereof by the curtesy: *Provided,* that if the wife, at her death, shall leave issue by any former husband, to. whom the estate might descend, such issue shall take the same, discharged from the right of the surviving husband to hold the same as tenant by the curtesy." *Ch.* 66, § 30. This section, in requiring a joint seizure in husband and wife, was less broad than Section 27 of Chapter 85, and would seem to be idle and futile if curtesy was given by that section in all cases where the wife was seized of an estate of inheritance, and the husband survived her.

It will be seen that thus far no power is in terms given to the wife to dispose of her property, or of the issues thereof, except with the consent of the husband, or under the order of some court of competent jurisdiction; and the main purpose of the statutory provisions which protected her in the title, would seem to have

been to preserve the property for the benefit of the family against its being squandered by the husband or seized by his creditors. But the Constitution of 1851 went further, and added to a provision in substance the same as the act of 1844, the words, " *and may be devised or bequeathed by her as if she were unmarried.*" *Art.* 16, § 5.

We come now to the act of 1855, " relative to the rights of married women," *Comp. L.* § 966 ; which not only embodies this constitutional provision, but in brief and comprehensive words gives to the wife full and absolute control of her real and personal estate, with power to contract, sell, transfer, mortgage, convey, devise and bequeath the same, in the same manner and with the like effect as if she were unmarried. It is difficult to read this statute without coming to the conclusion that it was designed to cover the whole subject embraced in the provisions of sections 25, 26 and 27, of chapter 85, above quoted. We have no doubt such was its purpose. And not only does it totally abrogate all control of the husband over the wife's property, and authorize her to dispose of it without the intervention of any court; but it also fails to re-enact the provisions of section 27, and thereby by implication, as we think, repealed them. *Dash v. Van Kleeck*, 7 *Johns.* 497 ; *Giddings v. Cox*, 31 *Vt.* 609. And we have now to see whether the general provision on the subject of curtesy above quoted from the Revision of 1846 ( *Ch.* 66, § 30,) is consistent with this act of 1855, and the constitutional provision quoted, and can stand with them.

At the common law the incidents to curtesy were, marriage, seizin in the wife of an estate of inheritance, birth of living issue, which by possibility might inherit it, and death of the wife. *Co. Lit.* 29, *b ;* 4 *Kent,* 29. The husband's right became initiate the moment the issue was born. The husband and wife were said to be *jointly* seized ; *Melvin v. Proprietors, etc.* 16 *Pick.* 161 ;

*Weisinger v. Murphy*, 2 *Head*, 674; and this is the idea of our statutes of 1838 (*p.* 265), and of 1846 as above quoted; though the actual *right* for the life of the husband was in him, and might be taken and sold on execution. *Mattocks v. Stearns*, 9 *Vt.* 326; *Roberts v. Whiting*, 16 *Mass.* 186; *Canby's Lessee v. Porter*, 12 *Ohio* 79.

That the common law estate by the curtesy cannot exist in this state under the statutes now in force, is too apparent for argument. But the estate, under the Revised Statutes of 1846, was quite different from that at the common law. It required no birth of issue, and it did not become initiate in the life time of the wife. *Hathon v. Lyon*, 2 *Mich.* 93. But in many of its provisions it was as inconsistent with the constitutional provisions and the act of 1855, as was the estate at the common law.

It required joint seizure in husband and wife, in the right of the wife; which has not existed in this state since the act of 1844, except in those cases where the wife's title had accrued prior to that act, and the husband's right had then become initiate. It gave from the wife's fee a life estate to the husband at her death, while the act of 1855, gives the full power to devise the same, "in the same manner and with the like effect as if she were unmarried."

Its effect was to make the inheritance subject to the " debts, obligations and engagements" of the husband, if he survives her, though the act of 1855, in carefully chosen words, expressly declares that none of her property shall be so liable.

And we should be required to hold, in order to support the statutory estate by the curtesy, that the statute, when it declares that the wife's real estate shall be and remain hers the same as if unmarried, means only that it shall be and remain hers in a qualified and usufructory sense, but subject to have a freehold estate

carved out of it, for the benefit of the husband or his creditors, to the exclusion of her heirs, although, had she remained unmarried, it would have been subject to no such contingency.

And it would also be necessary for us to hold that the words employed by the Legislature of 1855, apparently chosen with skill to carefully exclude any construction that the wife's estate in or control over the land is to be any other or different from what it would have been had she remained single, are notwithstanding to be qualified by some implied understanding which attaches to it certain incidents growing out of the marriage relation.

Great as are the changes made by the act of 1855, it does not take from the husband the right to the joint earnings of himself and his wife, by means of which the accumulations during coverture come exclusively to him. *Glover v. Alcott*, 11 *Mich.* 470. And it expressly exempts him from liability on any contract by the wife in relation to her sole property. These facts are not to be overlooked when we are endeavoring to arrive at the legislative intent.

The purpose of the act of 1855 to protect the family against the consequences of the husband's dishonesty or improvidence, is still more apparent than in the case of the preceding provisions on the same subject. It not only preserved to the wife all her rights in her own property as if she had remained sole, and gave her full power of control and disposition, but it also supplemented the exemption laws by authorizing her to sue in her own name for property of the husband which the statute had made exempt from levy, sale or mortgage by him without her consent. The homestead provisions, with the like intent, avoid any conveyance of the homestead by the husband without the wife's signature. But these exemptions are from the husband's own property; and we should hardly expect to find other provisions in force

at the same time, which, on the death of the wife, would vest a life interest in her own real estate in him, to the exclusion of the children, if any, and without any check upon his power to dispose either of that or of the personal means of support which the statute so carefully protected against his acts during his wife's life time.

The question before us we think is disposed of by the positive and unambiguous terms employed in the statute; but it may be well to refer to the few cases which bear upon it. In *White v. Zane*, 10 *Mich.* 333, which was a suit between the husband on the one side and the wife's administrator on the other, for personal property of the wife left in the husband's possession at her death, this court in effect decided that under the statute the wife's personalty is not simply to "be and remain" her's during her life time, but that the husband's common law interest therein was altogether excluded. Decisions upon kindred questions elsewhere are not uniform, and it is perhaps not important to refer to them except as they relate to the particular estate in question. In *The Junction Railroad Co. v. Harris*, 9 *Ind.* 184, it was held that a statute which declared the wife's real estate her "separate property," free and clear of all claims of the creditors and legal representatives of her husband, as fully as if she had never been married, but which, so far as the case shows, did not in terms authorize her to sell or devise the same, did not cut off an estate by the curtesy which had become initiate, and could not constitutionally be made to do so. The statute, it will be perceived, is quite different from the one we are called upon to construe, and the question was as to its retroactive effect. In *Hurd v. Cass*, 9 *Barb.* 366, arising under a statute very nearly like ours of 1855, though perhaps not quite so comprehensive, Judge Mason, sitting in the Supreme Court at special term, held the estate by the curtesy not affected by the statute. To arrive at this conclusion the old rule was applied, that a statute in dero-

gation of the common law is to be strictly construed; a most excellent rule when rightly applied, but which has often been employed to torture words into expressing a meaning which was not in them. The case of *Hurd v. Cass,* was followed by *Clark v. Clark,* 24 *Barb.* 581, which was also the decision of a single judge at special term. No case in New York has undertaken to consider the question at length, except *Billings v. Baker,* 28 *Barb.* 343, which holds curtesy abolished. In the subsequent case of *Thurber v. Townsend,* 22 *N. Y.* 517, a decision is made by the Court of Appeals which, as we understand it, overrules the two cases of *Hurd v. Cass, and Clark v. Clark supra,* and settles the law of New York in accordance with the views we have expressed.

The present case does not call for any opinion as to the effect of the constitutional provision we have quoted upon estates by the curtesy which had become initiate before the act of 1844, nor as to the state of the law between 1844 and 1855. The descent of the land in question to the wife was in 1855, and her death took place in 1857. We are entirely satisfied that Proctor Tong had no estate by the curtesy in the land, and that on neither point was the demurrer well taken. We think it legally impossible that a woman's estate should remain unaffected by her marriage, and the husband at the same time acquire by the marriage an estate, either vested, initiate or contingent, in it.

The decree of the court below dismissing the bill must be reversed, the demurrer overruled, and the cause remanded with leave to defendants to answer on payment of the costs of this court and ten dollars costs in the court below.

CAMPBELL and CHRISTIANCY JJ. concurred.

MARTIN CH. J. I concur in the result.