| 55 | 39 |
| 63 | 252 |
| 63 | 567 |

| 55 | 39 |
| 118 | 67 |

## MARY L. REEG v. JAMES K. BURNHAM, ALBERT H. MUNGER, FREDERICK C. STOEPEL, GEORGE A. CORWIN, AND LEONARD REEG.

*Trustee de son tort—Bill to reach equitable assets—Technical pleading—Preliminary lien—Laches—Decree not impeachable collaterally—Rehearing.*

1. One who receives the goods of another and disposes of them with the knowledge that the latter is fraudulently seeking to save them from execution, becomes in equity the latter's trustee and is liable to his creditors to the amount of the goods transferred.

2. Where a bill in equity is grounded on fraudulent intent, technical formality in its averments will not be exacted, in the absence of a demurrer, if the complainant's substantial rights appear and the grounds of equitable relief are stated. Nor will a demurrer make any difference unless it is brought to a hearing or relied on upon the argument.

3. A bill in equity averring the return of an execution unsatisfied and the existence of equitable assets fraudulently transferred to a portion of the defendants and sold by them to innocent purchasers, is a sufficient basis for claiming that the proceeds of such sales shall be applied to the payment of the decree. It brings complainant's case within either of the two classes of relief allowed to judgment creditors; viz.: by bill in aid of execution to set aside fraudulent transfers, or by bill to have the judgment paid from property beyond the reach of execution but equitably applicable to its payment. The lien to be obtained before filing a bill is unnecessary when the property is not in the hands of the fraudulent grantee at the time of filing it.

4. Laches is not chargeable for failure to institute proceedings in equity to satisfy a decree from the proceeds of property fraudulently transferred and sold, so long as the proceedings of the transferees are kept secret.

5. A decree for alimony by a court with jurisdiction, cannot, if not appealed from, be impeached in a proceeding to reach the proceeds of goods fraudulently transferred by the defendant.

6. Rehearing will not lie where nothing is involved but the gains and losses of a venture dependent on fraud.

7. A court of review will not consider whether the remedy sought is the best so long as it is admissible.

Appeal from the Superior Court of Detroit. (Chipman, J.) June 25.—October 8.

BILL to reach equitable assets. Complainant appeals. Reversed.

*Fraser & Gates* for complainant. A levy is not pre-requisite to a creditor's bill: Bump. Fraud. Conv. 526: How. Stat. § 6614; *Smith v. Thompson* Walk. Ch. 1; *Albany Bank v. Dorr* id. 318; *Clark v. Davis* Har. Ch. 234.

*Geo. S. Hosmer* (*Dickinson, Thurber & Hosmer*) for defendant. Property cannot be reached in equity to satisfy an execution until a lien has been obtained on it: Bump. Fraud. Conv. 521; *Fox v. Willis* 1 Mich. 321; *Thompson v. Van Vechten* 27 N. Y. 568.

SHERWOOD, J. On the 9th of October, 1880, the Superior Court of Detroit made a decree in a suit for divorce in favor of complainant and against the defendant Leonard Reeg, and for alimony. On the 30th day of August, 1881, thirty dollars was due and unpaid on the decree for alimony, and execution was issued thereon and returned by the sheriff unsatisfied for the want of property from which to make it. On the 5th day of January [1883] there was due and unpaid upon said decree, by the terms thereof, $765.64, and on the next day complainant caused execution to be issued therefor, which was returned unsatisfied. On the 11th day of January, 1883, the judge of the Superior Court made an additional decree in said cause in favor of the complainant, and against the defendant Reeg, for the sum of four thousand dollars, to be

paid forthwith by the said defendant, and that complainant might have execution therefor. On the 12th day of March, 1883, complainant caused execution to be issued against the defendant Reeg for the amounts then due upon said decrees, and placed it in the hands of the sheriff, and that said writ, for the want of property, was returned unsatisfied on the 14th day of May thereafter. The bill in this case was filed on the 12th of March, 1883, by the complainant as a judgment creditor, and for the purpose of reaching personal property of defendant Reeg to satisfy the above-mentioned decrees, in the hands or under the control of the other defendants, but which is alleged to be equitably the property of the defendant Reeg, the legal title thereto having been fraudulently transferred by him to his co-defendants for the purpose of defrauding the complainant out of the moneys due upon said decrees.

In addition to the facts above stated, the bill avers that at the time of making the first above-mentioned decree, and for several years previous thereto, defendant Reeg had been engaged in mercantile business in Detroit, and continued to be thereafter until about January 1, 1883; that at the time of filing the bill he had a large amount of claims outstanding due to him, for which he held paper and other securities, and owned a large amount of goods and wares and other personal property, which belonged to him and in which he was interested, and which he might and ought to apply to the payment of her decrees; that he owned and controlled, in a store occupied by him in Detroit, a large stock of dry goods, notions and ladies' goods, and other merchandise, more than sufficient to satisfy her decrees; and that for ten months prior to filing her bill the defendants, other than Reeg, have been in possession of them and pretend to be the owners of them.

The bill further avers that Reeg is the equitable owner of said property, and has been for several years, and that if he has made any transfer of the same it has only been colorable, and made with a view to protect them against the decrees of complainant, while Mr. Reeg in fact enjoys the avails thereof, and that the other defendants had notice of these facts; that

the other defendants, or some of them, have under their control other property, debts, things in action or effects in possession belonging to or held in trust for the said defendant Reeg, beyond the reach of execution, and which she asks to have applied to the payment of the latter's indebtedness, and which ought to be so applied.

The complainant also shows and avers, in a supplemental bill, the issuing of execution and its return not satisfied, upon the last decree as above stated. The relief asked is that the property of Reeg aforesaid, may be applied to the payment of her decrees; that an account be taken, under the statute, of the property received by the other defendants from defendant Reeg; that the defendants be enjoined from disposing of any of such property; and that a receiver be appointed, according to the practice of the court and for the usual purpose in such cases, and further prays for general relief.

The bill was taken as confessed by the defendant Reeg, he failing to appear or answer. The other defendants made their joint and several answer thereto, wherein they say they have no knowledge or information in regard to the decrees, amounts due thereon, or the efforts to collect them stated in the bill. They admit that defendant Reeg was engaged in the mercantile business before and after the time the bill in this case was filed, and up to the last day of August, 1881, but deny that thereafter he was engaged in business on his own account, or otherwise than as an employee of another; and deny that defendant Reeg had any property, things in action or equitable interests, except what was exempt from execution, after the last-mentioned date, as charged in the bill. They admit that he kept store in Detroit, and that he had a stock of dry goods, but deny that the stock was large or valuable, or that he owned or had any interest therein after September 1, 1881.

The defendants further admit that Corwin, or those claiming under him, was, within two months immediately preceding the filing of the bill, in possession of a certain stock of goods in the store in Detroit mentioned in the bill, but aver that the stock did not belong to defendant Reeg,

and that he had no interest therein, and that Corwin, or those claiming under him, were the owners thereof. They further deny that Reeg has or had any goods in Detroit, except a few store fixtures, since about the 13th of September, 1881, or that said defendants, or either of them, have any property in their possession belonging to said Reeg, or in which he has any interest, and hold no property in trust for him.

Defendants further aver that defendants Burnham, Munger and Stoepel were copartners under the firm name of J. K. Burnham & Co., and engaged in the wholesale dry goods business in Detroit, and about the 13th of September, 1881, defendant Reeg, having less than twelve hundred dollars worth of goods, which were mortgaged, and being indebted for rent and unable to continue in business longer, went to J. K. Burnham & Co. and offered to transfer to them, or any person they might designate, his stock of goods, provided the business could be continued, and he, defendant Reeg, be given employment in the business; and further say that J. K. Burnham & Co. yielded to his solicitation therefor, and Reeg executed a bill of sale to J. K. Burnham & Co.'s clerk, at Burnham's suggestion, one Edward H. Dunning, who continued the business in the store where defendant Reeg had done business, and continued him in the store and in charge of the business—J. K. Burnham & Co. really being the owners and who subsequently paid up the back rent due and the mortgage on the goods, and furnished to said Dunning such goods as defendant Reeg from time to time selected, the latter having the charge of and operating the business, and drawing therefor enough to pay his personal expenses, and relying on the company for his compensation and such as they saw fit to give him; that in this manner Reeg continued the business until September 16, 1882, under the name of E. H. Dunning & Co.; that about that date said Dunning, in the name of E. H. Dunning & Co., at the request of J. K. Burnham & Co., executed a bill of sale of the stock, fixtures and furniture to the defendant Corwin, in consideration of his assuming the liabilities which had been contracted in the business, and thereafter the busi-

ness was conducted in a similar manner by defendant Reeg, under the name of Corwin & Co., until the 3d or 4th day of January, 1883.

Defendants answering further, aver that the business said Reeg did was not profitable; that the assets inventoried $6937.26, and that the indebtedness to J. K. Burnham was $6353.07, and that the goods inventoried were in fact worth not more than sixty per cent. of the inventoried price, by reason of the same being broken, and thereupon J. K. Burnham & Co. removed Reeg from further connection with the business; that the stock was insufficient to pay the indebtedness; that a short time after this Reeg claimed to own some fixtures and furniture in the store which he had not sold, and represented that he was in need of money to go west with, and the defendants not recognizing his pretended claim, but desiring to help him, and in consideration of a settlement of all matters between them, gave Reeg $290; that J. K. Burnham lost by said Reeg from one to two thousand dollars; that said Reeg has not by reason of the premises any claim, legal or equitable, against these defendants, or any interest whatever in said stock of goods.

Defendants answering further, aver that complainant, prior to filing her bill of complaint, took garnishee proceedings against the defendants upon the first decree; that disclosure was made and issue joined therein, and that the same is still pending against said J. K. Burnham & Co. and said Corwin. Defendants also claim the benefit of a demurrer in their answer.

The case was heard before Judge Chipman in the Superior Court on pleadings and proofs. The complainant's bills were both dismissed, and she now asks a review in this Court.

From the proofs in this case it appears that the defendant Reeg resided in Detroit, and carried on the business of a dry goods merchant for a period of about twenty-eight years immediately before the defendant obtained her decrees against him, and continued to do business there until about the 5th day of January, 1883, and to reside there until about the

12th of September thereafter; that from the time of the rendition of the first of said decrees until the 13th of September, 1881, the defendant Reeg had on hand at his store a stock of goods worth from $1200 to $3500; that during said period execution was issued upon the first of said decrees against the property of said defendant Reeg, but because of two mortgages made thereon to J. B. Corliss and filed, one for the sum of $1700, dated July 15, 1879, and the other for the sum of $2500, dated September 9, 1879, the sheriff did not levy; that these mortgages were given without consideration; that defendant Reeg did not owe said Corliss any of the time over $120; that Corliss made a renewal affidavit in August, 1880, in which he stated that there was $1200 due on the last-named mortgage; that on the 5th day of July, 1881, another chattel mortgage was filed, signed by defendant Reeg, purporting to be given for $2000 to the said Corliss to secure a note of that amount due September 13, 1881; that on the 27th of August, 1881, said Corliss filed in the clerk's office a bill of sale of said stock, running to him, purporting to be for the sum of $2000 given by defendant Reeg the day before, although no consideration seems to have been given for either; that on the 13th of September following the said Corliss gave a bill of sale of said stock to one Dunning (called in the bill of sale Dunning & Co.), a clerk of J. K. Burnham & Co., and purporting to be for the consideration of $2300; no consideration, however, having been paid therefor other than what appears in the following instrument, which seems to have been agreed upon between the defendant Reeg and J. K. Burnham & Co., viz.:

"DETROIT, MICH., September 13, 1881.

For and in consideration of the transfer to us, this day made by John B. Corliss, of Detroit, Michigan, of all the goods, wares and merchandise situated in store No. 207 Woodward avenue, Detroit, we, the undersigned, hereby agree by and with the said Corliss that we will supply L. Reeg with a suitable line of goods in said store, and allow him to manage said business under our direction so long as we shall deem the same safe and beneficial; and in case said business is closed by us for any cause, we agree to turn over

to said Corliss, or his order, all there may be in the stock of goods in said store managed as aforesaid, after realizing full payment for our advancements of stock and disbursements during the continuance thereof, and interest on past-due accounts; and also we agree to transfer said stock and all accumulations thereof to said Corliss, or his order, at any time that we are fully paid for all advances made as aforesaid.                    EDWARD H. DUNNING & Co.

Indorsed : I hereby transfer the within contract to Leonard Reeg without recourse to me.          JNO. B. CORLISS."

That on the 15th day of September, 1882, by the direction of J. K. Burnham & Co., consented to by defendant Reeg, said stock of goods was transferred by bill of sale from said Dunning (under the name of Edward H. Dunning & Co.) for the named consideration therein of $5280.94 to one George A. Corwin (under the assumed name of Corwin & Co.), another clerk of J. K. Burnham & Co.; that all these changes, including the bill of sale from Corliss, were made by arrangements with J. K. Burnham & Co. by the defendant Reeg and for his benefit, and that neither Dunning nor Corwin had any interest therein, and were only nominal parties occupying the positions they did at the request of J. K. Burnham & Co., and consented to by Reeg; that no consideration passed on the making of the bills of sale between the parties thereto.

The following testimony given by J. K. Burnham also appears in the case relating to the transfer of this stock of goods, viz. :

"I have known Leonard Reeg, of this city, eight or ten years. I have known John B. Corliss three or four years. I was aware of the fact that in Mr. Reeg's litigation with his wife Mr. Corliss has been acting for him as his attorney, as adviser; I did not know that he ever had any cases for him. I know the store No. 207 on Woodward avenue. I know that Mr. Reeg did business there as a dry goods merchant. * * * Early in September, 1881, I had a talk with Mr. Reeg. He had been trying to buy goods of us for five or six years. We never would give him any credit, never would trust him for any goods; everything we sent up C. O. D. He came to me and represented matters and wanted credit early in Sep-

tember. I don't know but Mr. Corliss came and said he had a bill of sale of the property, and said he thought there was in the neighborhood of $1200 or $1500 worth of goods there; that he could not pay expenses on that amount of goods, and he wanted some one to give him credit—put some goods in there. I declined to do anything with it, and they came again, and said if we would sell some goods to that concern up there they would give us a bill of sale of the goods—turn them over; they should be wholly in our charge; and I agreed to put in some $1500 worth of goods, and take those goods that were in the store and pay up their bills that they could not pay—the insurance, rent and whatever might be so agreed upon. I decided to advance that money and take a bill of sale of that stock. The bill of sale was taken in the name of Dunning & Co. Dunning is the only man concerned in the firm of Dunning & Co. The company was a mere nominal matter. Mr. Reeg has no interest in that store and its business, and none whatever in the goods that are in the store. Mr. Reeg has been in that store until within a few weeks. He managed the business there, hired the clerks, and I suppose discharged the clerks that were discharged, and paid the clerks, too. He did not have charge of the goods; he merely selected the goods for that stock."

This testimony was given in February, 1883. It further appears from his testimony that he did not know of the indebtedness of Mr. Reeg at the time he took the bill of sale, except some back rent due Corliss, taxes and insurance, which J. K. Burnham & Co. paid, amounting to between $350 and $700, and that is what they paid Reeg for the goods on the sale to Burnham; that no inventory was taken of the stock at the time of the sale; that Reeg, in the management of the business, bought goods of other parties than J. K. Burnham & Co. at his pleasure; was never asked to account for the proceeds of the business; that when Reeg left the business, in January, 1883, J. K. Burnham & Co. did not owe Reeg anything, but on his request gave him $290 to go west with, and took his receipt therefor in full of all claims on settlement.

The testimony of defendant Reeg, under an order of the court on the 20th day of March, 1883, was offered in evidence by complainant's counsel, wherein he testifies in the

most positive terms that the mortgages and bill of sale mentioned were all given without consideration, and for the purpose of preventing creditors from making their claims; that he did not owe Corliss anything for which the obligation was given. He further testifies that a few days after he gave the bill of sale to Corliss he went to J. K. Burnham & Co. and told Burnham " the shape he was in;" that he owed about $800 for merchandise and could not pay it, was hard up and had alimony to pay, and did not wish to pay that; told Burnham that he owed Corliss $105, and if he would let him have goods he could make money at his store and shield him from the attacks of his creditors, and he would be safe himself, and the next day Burnham told Reeg he would do it; that they went to Corliss' office and consulted about the way to do the business, and then it was agreed upon that Corliss should convey the stock to Dunning for Burnham & Co., who were to pay Reeg's debt to Corliss, and the papers were all made under Corliss' and Burnham's direction; that at his (Reeg's) request Exhibit 15 [the instrument dated September 13, 1881, and before set forth] was made and transferred to him, so that he could go on with his business; that the bill of sale was not intended to be absolute, but only a shield for Reeg against his creditors; that the stock of goods mentioned in the bill of sale was at that time worth from $3000 to $3500 ; that he (Reeg) carried on the business afterwards as he usually had done, bought goods of J. K. Burnham & Co., and paid for them, and never accounted for any goods sold to any one ; that no person but himself had the management and control of the business and the goods, and no one interfered with him or his business; that his place of business and his signs remained the same after as before the bills of sale were made, and that the only moneys he used from the business were what he paid for running it, for goods and for his own personal expenses; that he did not pay any of his other creditors; that the largest amount went to J. K. Burnham & Co. for goods, for which he had their statement of account both for goods received and moneys paid; that he never paid Dunning or Corwin anything, but lent the latter money, $40 of which

constituted a part of the $290 received by him of J. K. Burnham when he left; that J. K. Burnham & Co. had nothing to do with the business except to sell him goods, and they never paid anything for him except the money to Corliss; that he held the lease of the store in his own name all the time, which did not expire till April, 1884, and never transferred it; that after the transfer from Dunning to Corwin, and about the last of December, 1881, or first of January, 1882, an inventory of the stock was taken; that Burnham's clerks helped to take it, and it amounted to about $7000, but Burnham & Co. never allowed him to look it over; that he does not know that all the goods were put on the inventory— thinks they were not; they marked the goods too low, put down dress goods at a shilling which cost eighty cents per yard; that he paid all the taxes on the goods; that on the 5th of January, 1883, after the inventory was taken, Burnham & Co. sent Corwin up to the store and took possession; that the stock of goods at that time was worth $9000 or more, and that his inventory in January, 1881, amounted to $4500.

Reeg further testified that he was surprised and bewildered when he found he was to be turned out, but Burnham & Co. had him in their power and he could do nothing; that he tried to get them to give back goods to the amount of his interest, and they refused; that he then tried to get them to take out goods to the amount of his indebtedness to them, and let him have the rest, and this they refused; that he then tried to get them to let him have $500, and he finally got $290 and about $70 in accounts of them, as above stated; that he never made any settlement with them; that he never received any more money from any of them, and never gave any receipt on a settlement of his matter with Corwin, Burnham & Co., or Dunning.

The foregoing is the substance of the testimony of Mr. Reeg. Several witnesses (Reeg's clerks) were sworn on the part of complainant, whose testimony was mostly corroborative of Reeg's statement of his doing the business, and the manner of doing it; also of the statement of Reeg that the

goods belonged to him, but that he was trying to defraud complainant out of her alimony, and was doing business under other names to get rid of paying the alimony.

Mr. Burnham and several of his clerks were sworn for defendants, and testified to the effect that the consideration paid for the bill of sale to Dunning was about $350, paid by Burnham & Co., and that they advanced about $700; that when the stock was transferred to Corwin there was owing to them about $4000 or $4500; that the inventory taken in January, 1883, showed the value of the goods $6937, but that they were worth not over $4500, and that on the 13th of September, 1881, the stock was not worth over $1500; that when Burnham & Co. entered into the arrangement with Reeg they did not intend to give him a line of credit of more than $1200, but that he did get $4500, and that they then took possession of the stock of goods, after offering to let Reeg have it for less than that amount if he would pay it.

Several other witnesses were sworn on the part of the defendants, tending to show the value of the goods, and that Reeg's credit was bad.

The foregoing is a brief summary of the pleadings and proofs as shown by the record. The testimony is very conflicting, indefinite and unsatisfactory as to the value of the Reeg stock, both at the time the bill of sale was made to Dunning, and also at the time J. K. Burnham & Co. took possession of the stock in January, 1883. It is, however, quite certain that Reeg must have known their amount and value, when the bill of sale was made, better than any of the other witnesses, and he puts the value at $3000 or $3500 at that time. I think their fair value, from the testimony, may be safely placed at $2500. I am not satisfied that the evidence shows Mr. Reeg's interest in this stock was increased in value by his management between that time and the time J. K. Burnham & Co. took possession, and if they can be held at all responsible in this case to account to the receiver for the goods, the amount should not exceed the sum named.

There is no question about the indebtedness of Reeg to

the complainant at the time of the transfer of the goods by him to Dunning, or at the time of filing the complainant's bill, or that at the latter date it exceeded the sum of $2500, and I think the fraudulent intention of Mr. Reeg in making the pretended mortgages and sales of his stock of goods to Corliss, and procuring the same to be made to Dunning and to Corwin for J. K. Burnham & Co., is equally clear; that it was to place them beyond the reach of legal process issued upon the complainant's decrees, and in fraud of her rights to the extent of the value of the goods so transferred. That such fraudulent intent of defendant Reeg was known to J. K. Burnham & Co., and participated in by them, is not so apparent from the evidence, but the testimony of Reeg upon this point, if believed, places it beyond doubt. I think the circumstances accompanying the transaction, and the dealings between the parties, are very strongly corroborative of Reeg's testimony upon this question, and I cannot escape the conviction that the preponderance of the evidence on this point is that J. K. Burnham & Co. and the other defendants had knowledge, or were in possession of facts from which they must be held to have had knowledge, of the fraudulent intent of Reeg in making the transfer, and their action served as a cover of Reeg's property, and prevented the sheriff from taking it on execution to satisfy the complainant's decrees.

J. K. Burnham, as the evidence shows, had known Mr. Reeg ten or twelve years; knew that his commercial honesty and his commercial credit were bad; that he had been purchasing on credit, and could no longer, except for cash; that he had been trying to purchase of J. K. Burnham & Co. on credit for five or six years, and had been all the time refused; that he had been in litigation with complainant. He knew the existence of Corliss' mortgages, which stated Reeg's indebtedness to him at over $3000, and knew that it was not true, as Burnham paid the actual indebtedness thereon, with $119.47; that the bill of sale to Corliss was a sham; that Reeg was unable longer to continue his trade in his own name and escape the complainant's execution, and that Reeg desired him to name the

person under whom he could continue the business in which he was then engaged, and whom J. K. Burnham & Co. could control; and that Reeg had alimony to pay and wished to avoid it.

With all these facts before him, it is impossible for me not to come to the conclusion that all the defendants must be held to have known of the fraudulent intent of Mr. Reeg to prevent complainant from making her claim out of his property, and that the action taken by J. K. Burnham & Co. could not fail to hinder, delay and defraud Mr. Reeg's creditors. Certainly the facts were sufficient to lead any honest, prudent business man to that conclusion, and that is all that is required to make him liable. Bump. on Fraud. Conv. (2d ed.) 308, 309, and cases there cited.

The whole transaction and the operations of the defendants present very singular proceedings for business men engaged in an honest endeavor to meet and discharge legal liabilities to their creditors. Indeed, they did not seem to quite agree upon this point among themselves. Under the view herein taken of the case, of course the ignorance or honest intentions on the part of the defendants J. K. Burnham & Co. cannot save them from liability. They have sold and disposed of the goods to innocent parties, so far as the testimony shows, and they are beyond the reach of process upon the decrees of complainant in legal or equitable proceedings in her behalf, and J. K. Burnham & Co. have received the pay therefor. To the extent, therefore, of the amount we have heretofore mentioned, they are in equity the trustees of Mr. Reeg, and the complainant has the right to have that amount applied to the payment of her decrees.

The remaining question is, has the complainant the right to have the application made under the proceedings she has taken? It is urged that the claimed settlement between Messrs. Reeg and Corwin, and the receipt given by the former, was a recognition by him of the right of Corwin to take possession of the goods; but such recognition, if it may be considered as such, is of no consequence, since whatever Corwin did in the premises was so done in the interest of

Burnham & Co. and with Burnham's knowledge, if not his direction.

It is further claimed that complainant's bill is insufficient, under the law and rules of practice, to cover the case claimed upon her proofs, and that therefore she cannot have the relief she prays. The bill of complaint is not, perhaps, as artistically drawn, or so specific in its averments of some facts disclosed by the proofs as it might have been, relating to the. defendants' dealings with the property, its character and value ; but the bill was not demurred to by any of the defendants, and technical nicety or formality in statements or averments will not be looked after very closely in such cases if the substantial rights of the complainant appear, and the grounds of equitable relief are stated in the bill. I quite agree with Mr. Justice Campbell that in this class of cases "there are difficulties in requiring very specific averments in cases of fraudulent intent, and the rules of pleading do not contemplate that evidence shall be set out in a bill." *Tong v. Marvin* 15 Mich. 60. "No universal rule can be laid down where most of the facts must necessarily be within the knowledge of defendants." *Hubbard v. McNaughton* 43 Mich. 220. It is true, the defendants in their answer claim the benefit of a demurrer; but the record does not disclose that it was ever brought to a hearing, or relied on upon the argument.

Equity gives relief to the judgment creditor in two ways: *First*, in aid of an execution at law for the purpose of setting aside fraudulent transfers of property sought to be reached by that process; *second*, by bill to have the judgment paid or satisfied out of choses in action or other property of the debtor not liable to execution, or that cannot be reached by execution, and which the debtor in equity should apply to the payment of the judgment. *Beck v. Burdett* 1 Paige 305; *Williams v. Hubbard* Walk. Ch. 28. The bill may be filed in a proper case to embrace both kinds of relief provided. *Williams v. Hubbard* supra; *Clark v. Davis* Har. Ch. 227; *Cuyler v. Moreland* 6 Paige 274.

The bill in this case avers the judgment, issue of execu-

tion thereon, and return of same duly made, unsatisfied; also that there are equitable assets owned by and under the control of the defendants, and their refusal to apply the same; and that by fraudulent means, under colorable transfers, they are kept from the reach of the officers. This is sufficient to bring the complainant's case under each of the two classes of cases I have referred to. The testimony shows that defendants have transferred the property to innocent holders and received the pay therefor. The proceeds are not in a situation to be levied upon. Under these circumstances the transfers to Corliss, to Dunning, to Corwin and to the defendants become of no importance except to show the character of the transactions, each party being in possession of the facts necessary to impute to them knowledge of the intended fraud of Reeg when the transfers were made.

Defendant's counsel admits the bill is sufficient to reach the equitable assets of defendant Reeg in the hands of J. K. Burnham & Co., if the conveyances can be attacked under the averments made. I think the bill is sufficient, and that the testimony offered showing the facts above stated was competent.

In this case, so far as defendants J. K. Burnham & Co. are concerned, the complainant shows by her bill and her proofs that she has been defrauded by the conveyance to them of the goods, and by means of which she could not make the debt in due course of law. J. K. Burnham & Co. thus became the fraudulent grantees of the property as to complainant, and as such equity will hold them to account to her to the amount of her debt, if the property conveyed is sufficient for that purpose; and if not, then to the extent of the property received by them. It is only necessary to obtain a lien before invoking equitable aid, when the fraudulent grantee is in possession of property which may be levied upon at the time of filing the bill; and as we have already shown, such was not this case.

There was no laches on the part of complainant in not instituting her equity proceedings sooner. The whole proceeding so far as J. K. Burnham & Co. are concerned, was

kept as secretly as possible, and the facts could not be correctly ascertained—indeed were not ascertained until an examination of defendant Reeg was had under the special order of the court on motion of the complainant. Under such circumstances more than three months must elapse before laches can be successfully claimed by defendants.

The effect of the garnishee proceedings of complainant was not presented in the brief of counsel for defendants, and is therefore no further noticed here.

I think the decree of the judge of the Superior Court in this case dismissing complainant's bill should be reversed, and the cause remanded to the Superior Court of Detroit with directions to enter a decree in favor of the complainant and against the defendants for the sum of twenty-five hundred dollars and the costs of both courts, and for the proper execution thereof.

CHAMPLIN, J. concurred.

CAMPBELL, J. I do not take the same view of the testimony as my brethren, and am in favor of affirmance.

COOLEY, C. J. did not sit.

Afterwards, at the same term a motion was made for a rehearing, which was denied November 19.

*Griffin & Warner* and *C. A. Kent* for the motion.

*Fraser & Gates* against.

SHERWOOD, J. Motion is made in this case for a rehearing upon the following grounds :

1. "And your petitioners further show that said decree is erroneous because it is apparent that your petitioners received no more from Leonard Reeg than enough to pay for what they had contributed to the stock, and because they were not equitably indebted to him."

2. "Because it sufficiently appears in and by the proceedings that the decree for the payment of four thousand dollars alimony in gross, instead of ten dollars per week, and upon

which the decree in this case is based, was obtained by collusion, and is unauthorized."

3. "Because in no event can said complainant have been prejudiced by these defendants and their dealings with defendant Reeg beyond the sum of $730, which was the amount due and owing complainant when these petitioners took possession of said stock."

4. "Because said decree is against the weight of evidence."

The positions taken by counsel for the motion in their first, third and fourth points above stated were all fully considered by this Court upon the hearing, and we find no occasion to review them; still a re-examination of the case fails to modify our views already expressed.

As regards the second point, the Superior Court had jurisdiction in the case in which the decree for alimony was made, and which constituted the complainant a creditor of James K. Burnham, and no appeal was taken therefrom. We know of no rule by which that decree can be impeached in this case. Its validity was not attacked upon the hearing when the cause was fully argued by able counsel. We find nothing in this motion rendering a change in the opinion filed or a modification of the directions given for decree, necessary.

A re-hearing will not be had for the purpose of considering the gains or losses between parties engaged in a venture or enterprise of aiding or abetting fraudulent transactions. Neither do we feel called upon to consider whether or not the complainant in the action she has taken has selected the best remedy for redressing the injuries arising from the fraud perpetrated, when the one adopted is proper.

The motion must be denied with costs.

COOLEY, C. J. and CHAMPLIN, J. concurred.

CAMPBELL, J. I concur in the result, on the ground that no question is raised which was not considered before.